M. I. G. INVESTMENTS, INC., Plaintiff-Appellant and Counterappellee, *v.* GEORGE MARSALA *et al.*, Defendants-Appellees and Cross-Appellants.

Second District    No. 80-58

Opinion filed January 7, 1981.

Gregory E. Barrett, of Schlueter, Ecklund, Olson & Barrett, of Rockford, for appellant.

Daniel J. Cain, of Sreenan & Cain, of Rockford, for appellees.

Mr. JUSTICE UNVERZAGT delivered the opinion of the court:

Plaintiff, M.I.G. Investments, Inc. (hereafter M.I.G.), appeals from the judgment of the circuit court of Winnebago County awarding it $1,625.50 in compensatory damages and $744 in attorney fees against defendant 3 G's Disposal Service (hereafter 3 G's). M.I.G. asserts that the court erred in failing to assess damages for the period of time that co-defendant Gail Higgins, d/b/a Circle H Rubbish Disposal (hereafter Higgins) took over 3 G's routes and that the court erred in construing the liquidated damages clause of the contract between M.I.G. and 3 G's as a penalty and in failing to apply said clause in awarding damages to it. 3 G's cross-appeals contending that the court erred in finding that it had breached the contract between M.I.G. and itself.

M.I.G. and 3 G's entered into a contract whereby 3 G's would dump

at M.I.G.'s dump site all the solid waste material it picked up and hauled within a radius of 50 miles of the dump site. The term of the contract was for two years commencing on December 1, 1975, modified to October 15, 1975, and running to November 30, 1977, modified to October 14, 1977. 3 G's was to pay during the first year of the contract $1.20 per cubic yard of solid waste and $1.40 per cubic yard during the second year. Paragraph 9 of the contract was a liquidated damages clause entitling M.I.G. to 50% of the cubic yard dump charge for each yard dumped somewhere else. It further provided that liquidated damages would not be less than $800 per month whenever a breach occurred. The parties further agreed that their assigns and successors would also be bound by the terms of the contract.

3 G's complied with the terms of the contract during the first year, and it paid M.I.G. an average of approximately $900 per month for dumping. During the portion of the second year of the contract when it performed, it paid M.I.G. somewhat less than the $900 average per month. In February 1977, 3 G's entered into a sales agreement in the nature of a secured transaction with Higgins in which it agreed to sell its business and assets, including containers, customer lists and/or routes, three trucks, good will and the partnership name to Higgins for a specified price. Higgins had one route of her own which was added to the two 3 G's routes. Excluded from the bill of sale were the furnishings and office equipment of 3 G's, the tools and garage equipment, the accounts receivable through January 31, 1977, cash in the bank and any other assets not specifically included in the bill of sale. Higgins agreed, *inter alia*, to pay $125,000, $25,000 upon execution of the agreement, and the remainder in monthly payments with 8% per annum interest, the entire balance of the principal and interest due on January 20, 1982. Higgins also agreed "to continuously operate and conduct said business." 3 G's covenanted not to compete in any like business with Higgins for a period of seven years.

M.I.G. learned via the "grape vine" of the sales agreement between 3 G's and Higgins. George Marsala, one of the 3 G's partners, testified he could not recall for certain if he had informed Higgins of the contract between 3 G's and M.I.G. After February 1, 1977, however, neither 3 G's nor Higgins dumped any solid waste material which it had picked up within a 50-mile radius of M.I.G.'s dump site, despite the fact that Marsala was employed by Higgins and drove one of her trucks. In late June or July 1977, Higgins defaulted under the payment terms of the sales agreement and 3 G's resumed operation of the disposal service. 3 G's failed, however, to dump any of its solid waste material in M.I.G.'s dump between the time it resumed operations and the termination date of the contract between it and M.I.G. on October 15, 1977. 3 G's then sold the operation to Rockford Disposal.

M.I.G. filed a two-count complaint against 3 G's and Higgins. In its

answer, 3 G's failed to allege that the liquidated damage clause was void as against public policy. At trial, George Marsala testified that 3 G's did not comply with the contract because the road to M.I.G.'s dump site was in disrepair much of the time, causing its trucks frequently to become stuck in the mud or otherwise causing costly repairs. M.I.G.'s evidence on rebuttal strongly tended to refute this testimony. During closing argument, in response to an inquiry from the court, 3 G's argued that the liquidated damages clause was void as against public policy, and that M.I.G. failed to show that 3 G's ever picked up any solid waste material within a 50-mile radius of the dump site.

The court found for plaintiff M.I.G. against 3 G's only, but apparently found that 3 G's was not liable to plaintiff during the time Higgins operated the disposal service. We say "apparently" because this court has not been afforded a transcript of the hearing at which the court explained its method of arriving at the amount of damages to be awarded to M.I.G.; we rely on the "background" information supplied in M.I.G.'s brief on this point, which information was not disputed in 3 G's brief. It is clear, however, the court did not apply the liquidated damages provision in awarding M.I.G. a total of $2,369.50 in damages and attorney fees for the 8½-months' breach. M.I.G. filed its timely notice of appeal, and 3 G's filed its notice of cross-appeal.

Initially, we will address 3 G's cross-appeal. 3 G's argues that M.I.G. presented no evidence that it had picked up any waste material within 50 miles of M.I.G.'s dump site after February 1, 1977. It concedes, however, that this court cannot overturn the trial court's decision unless the trial court's decision was against the manifest weight of the evidence. *John J. Calnan Co. v. Talsma Builders, Inc.* (1977), 67 Ill. 2d 213, 218.

■■ In the case at bar, George Marsala testified that 3 G's stops were scattered throughout Rockford and Winnebago County, and that Higgins picked up waste material at these same stops during the time she operated the routes, although she eventually lost a few of the accounts. Although M.I.G. never established by direct evidence that its dump site was within 50 miles of 3 G's entire route, the court could take judicial notice that no place in Winnebago County is over 50 miles from Bonus Township in Boone County where plaintiff's dump site was located. (*Cribbs v. Daily* (1966), 67 Ill. App. 2d 441, 445.) Accordingly, we do not find that the trial court's finding as to 3 G's liability for breach of its contract with M.I.G. was against the manifest weight of the evidence.

We now address M.I.G.'s appeal. It asserts that Higgins was a successor in interest of the 3 G's disposal service. It argues that because 3 G's sold its entire business, it also must have sold its obligations to plaintiff including the obligation to dump at plaintiff's dump site. It concludes that when the 3 G's partnership repossessed the assets, the

customer lists and the good will it once again became liable on the contract, and also succeeded to the obligations and liabilities sustained by Higgins.

■■ Whether Higgins succeeded to the dumping obligations of 3 G's depends on the facts. The decision of the trial court will not be reversed unless the decision was clearly an abuse of its discretion. (*John J. Calnan Co. v. Talsma Builders, Inc.* (1977), 67 Ill. 2d 213.) It is clear that a purchaser of business assets assumes the obligations of its predecessor only where "there is an agreement express or implied, to assume the company's debts and obligations." (*Alexander v. State Savings Bank & Trust Co.* (1935), 281 Ill. App. 88, 96, quoting 15 Fletcher, Cyclopedia Corporations § 7122 (1973); *Johnson v. Marshall & Huschart Machinery Co.* (1978), 66 Ill. App. 3d 766.) The purchaser may otherwise be held liable for the seller's debts and obligations only in these three recognized exceptions: (1) where there has been a consolidation or merger; (2) the purchaser is merely a continuation of the seller; or (3) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligations. *Hernandez v. Johnson Press Corp.* (1979), 70 Ill. App. 3d 664, 667.

In the case at bar, there was no clear evidence that Higgins was informed of the contract between plaintiff and 3 G's. Marsala testified he thought he told Higgins, but he could not recall if he did or didn't. The fact that Marsala continued to work for Higgins or even that Higgins knew that 3 G's ordinarily dumped at M.I.G.'s site is insufficient to enable us to find that Higgins was aware of the contractual obligation owed by 3 G's to M.I.G. The effect of the sales agreement and the relationship between 3 G's and Higgins does not amount to a consolidation, merger or a continuation of 3 G's. Each of the parties retained their separate identities; none of the three partners comprising 3 G's had any interest in the management of Higgins' Circle H operation, and, although the trucks still had the name "3 G's" painted on them, Higgins' billing functions were performed under the Circle H name. Nor does it appear 3 G's fraudulently sought to avoid its obligation to M.I.G. since 3 G's performed, albeit only partially, on the contract until the time it entered the sales agreement with Higgins. 3 G's offered to resume the contract upon Higgins' default in July of 1977 if M.I.G. would provide adequate facilities and roadways. This offer was neither accepted nor rejected by M.I.G. It therefore appears Higgins did not know of the contractual obligation and did not expressly or impliedly agree to assume 3 G's obligation to dump at M.I.G.'s site. Therefore, the decision of the trial court to hold only 3 G's liable for breach of the contract was not against the manifest weight of the evidence. The sales agreement was clearly in the nature of a secured transaction, and 3 G's specifically reserved to itself

"all of the rights and remedies of the secured party under the UCC (Ill. Rev. Stat., ch. 26)." (Ill. Rev. Stat. 1979, ch. 26, par. 9—101 *et seq.*) Given this, it is apparent that the 3 G's partnership was not dissolved upon execution of the sales agreement with Higgins, and that 3 G's remained liable to perform its contract with M.I.G., either by itself or by agreement with Higgins.

■■■ Finally, we turn to the liquidated damages clause of the contract between plaintiff and 3 G's. A liquidated damages clause will be given effect if actual damages are difficult to ascertain and a liquidated damages provision is a reasonable estimate of damages which would actually result from breach of a contract. (*Hayden v. Keepper-Nagel, Inc.* (1978), 62 Ill. App. 3d 828.) At the outset, plaintiff asserts that 3 G's waived any consideration of the enforceability of the liquidated damages clause by failing to raise it as an affirmative defense, and that the trial court erred initially in this respect by *sua sponte* raising the enforceability of the liquidated damages clause, and secondly, in failing to award damages pursuant thereto. In support of its assertion, M.I.G. cites *Lu-Mi-Nus Signs, Inc. v. Jefferson Shoe Stores, Inc.* (1930), 257 Ill. App. 150 and section 43(4) of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 43(4)). Section 43(4) states:

> "The facts constituting any affirmative defense, such as payment, release, satisfaction, discharge, license, fraud, duress, estoppel, laches, statute of frauds, illegality, that an instrument or transaction is either void or voidable in point of law, or cannot be recovered upon by reason of any statute or by reason of nondelivery, want or failure of consideration in whole or in part, and any defense which by other affirmative matter seeks to avoid the legal effect of or defeat the cause of action set forth in the complaint, counterclaim, or third-party complaint, in whole or in part, and any ground or defense, whether affirmative or not, which, if not expressly stated in the pleading, would be likely to take the opposite party by surprise, must be plainly set forth in the answer or reply."

We do not feel M.I.G. can reasonably claim to have been taken "by surprise" that the liquidated damages clause would be required to undergo the court's scrutiny prior to enforcement. As stated in *Lu-Mi-Nus Signs, Inc. v. Jefferson Shoe Stores, Inc.* (1930), 257 Ill. App. 150, 154:

> "In all agreements fixing upon a sum in advance as the measure of liability, the question for determination is whether this violates the fundamental rule of compensation."

Prior to that, the court there had stated:

> "Ordinarily agreements are made to be performed but if from the face of the instrument it appears doubtful whether the parties

intended the sum specified as liquidated damages or a penalty, the decisions generally treat it as a penalty to cover the actual damages only, and this is for the reason that the party wronged is entitled to compensation only." 257 Ill. App. 150, 154.

■■ When breach of a contract which includes a liquidated damages clause occurs, a question of law arises which must be decided by the court before the provision may be given effect in awarding damages. Use of the term "liquidated damages" by the parties is not conclusive. (*United Order of American Bricklayers & Stonemasons Union No. 21 v. Thorleif Larsen & Son, Inc.* (7th Cir. 1975), 519 F.2d 331.) We do not believe 3 G's has waived consideration of this issue by failing to raise it as an affirmative defense, nor that the court erred in any way in *sua sponte* raising the issue of enforceability of the liquidated damages clause.

■■ The contract between M.I.G. and 3 G's required 3 G's to dump all the refuse it picked up within a 50-mile radius of M.I.G.'s dump site during the two-year period of the contract. No specific amount of refuse was required to be dumped, but a specific price per cubic yard of waste that was dumped was to be paid. As such, much was left to the discretion of 3 G's. 3 G's could, for example, not pick up any refuse and still not have breached its contract. The only limitation on 3 G's was that if it did pick up any refuse, it had to dispose of it at M.I.G.'s dump site. The provision for damages in the amount of 50% of the charge per cubic yard for waste dumped elsewhere contemplates that evidence would have to be introduced in order to establish the amount of waste which was dumped improperly. As such, the damages would be unliquidated. (*First National Bank & Trust Co. v. Maas* (1975), 26 Ill. App. 3d 733, 738.) A basic characteristic of a requirement or output contract is that neither the exact minimum nor maximum requirement or output is known. (See generally Corbin on Contracts §156 (1952).) Therefore, the stated minimum monthly damage assessment of $800 is unreasonable, since the amount to be picked up each month could not have been ascertained at the time the contract was entered into given the wide discretion afforded 3 G's to pick up as much refuse as it decides. As pointed out by defendants, if the $800 minimum provision was enforceable, 3 G's would be liable to pay M.I.G. that minimum amount if it breached the contract by dumping any amount of solid waste elsewhere, even if the quantity dumped was very small and the damages were readily ascertainable by application of the 50% formula. Therefore, it is our conclusion that the $800 minimum must be construed as a penalty. (*United Order of American Bricklayers & Stonemasons Union No. 21 v. Thorleif Larsen & Son, Inc.* (7th Cir. 1975), 519 F.2d 331.) Considering the apparent particularity with which dump sites record the size of each load dumped and by whom, it would not seem that a determination of actual damages would be either difficult or impossible.

In view of the above, we find the trial court did not err in failing to apply the liquidated damages clause of the contract in awarding damages to M.I.G.; however, we remand for a determination of the additional damages owed to M.I.G. for the period February 1, 1977, to July 1, 1977.

The judgment of the circuit court of Winnebago County is affirmed and remanded for determination of additional damages.

Affirmed; remanded with directions.

LINDBERG and VAN DEUSEN, JJ., concur.