Accordingly, based on the foregoing, judgment will be entered in favor of plaintiff in the total sum of $13,708.20, plus costs.

**JUSTINE REALTY COMPANY, Plaintiff,**

v.

**AMERICAN NATIONAL CAN COMPANY, Defendant.**

**No. 88–916C(1).**

United States District Court, E.D. Missouri.

Aug. 29, 1990.

Allen Boston and Robt. Golterman, Lewis, Rice & Fingersh, St. Louis, Mo., for plaintiff.

Michael Kahn, Gallop, Johnson & Neuman, Clayton, Mo., for defendant.

## MEMORANDUM

NANGLE, District Judge.

This matter was submitted to this Court on the parties' stipulations. This Court having considered the pleadings, the documents in evidence and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law. Fed.R. Civ.P. 52.

## I. FINDINGS OF FACT

### Parties and Jurisdiction

1. Plaintiff Justine Realty Company ("Justine") is a Missouri corporation and has its principal place of business in St. Louis, Missouri. Justine owns the building located 2000 Pratt Boulevard, Elk Grove Village, Illinois (the "Elk Grove Village Property").

2. Defendant American National Can Company is a Delaware corporation and has its principal place of business in Chicago, Illinois. In 1987, National Can Corporation merged with American Can Packaging, Inc., to form American National Can Company ("American National").

3. This Court has jurisdiction of this matter under 28 U.S.C. § 1332 because Justine and American National are citizens of different states and the amount in controversy exceeds the sum of $50,000.00, exclusive of interest and costs.

### History of the Landlord–Tenant Relationship

4. American National and its predecessors have been the tenant of Justine and its predecessors at the Elk Grove Village Property since 1960.

5. Attached as Exhibit 1 is a Lease Agreement for the Elk Grove Village Property between Arcecan Realty Company (as landlord) and R.C. Can Company (as tenant) dated April 15, 1960 (the "Lease"). The Lease covered the twenty year period of May 1, 1960, through April 30, 1980. For the first five years of the Lease, the yearly rental was $49,000.00. For the remaining fifteen years, the yearly rental was $56,000.00. The Lease was amended in 1964 to increase the rent and extend the term to August 31, 1980.

6. Attached as Exhibit 2 is an Amendment of Lease between the parties to the Lease dated February 1, 1967 (the "1967 Amendment"). The 1967 Amendment extended the lease term to January 31, 1987, increased the amount of space covered under the Lease, and raised the yearly rental to $215,400.00, payable in equal monthly installments of $17,950.00.

7. On July 31, 1967, R.C. Can Company merged with Boise Cascade Corporation, which became the lessee under the Lease. On November 30, 1967, Boise assigned its rights and obligations under the Lease, as amended, to American Can Company, which thereafter became the new tenant.

8. Attached as Exhibit 3 is an Option Agreement and Amendment of Lease between Arcecan Realty Company and American Can Company dated November 30, 1967 (the "Option Agreement"). Under the Option Agreement, the yearly rental remained $215,400.00, payable in equal monthly installments of $17,950.00 through January 1, 1987.

9. Paragraph 2 of the Option Agreement gave American Can Company the following options to renew the Lease at lower rental rates:

American [Can Company] shall also have an option to renew said Lease for either an additional ten year period or an additional 20 year period, the first ten years at $107,700 per year, or $8,975 per month (fifty percent (50%) of the original rent set forth) and the second ten years at $86,160 per year, or $7,180 per month

(forty percent (40%) of the original rent), PROVIDED, HOWEVER, that written notice to exercise said option must be given to Arcecan by American [Can Company] on or before July 1, 1982.
(Parentheticals in original.)

10. Thereafter, Justine became the successor-in-interest to Arcecan Realty Company under the Lease, as amended, and American Can Company subleased the property and was no longer a tenant (although it remained the lessee on the Lease).

### The Two Cook County Lawsuits

11. As set forth in paragraph 2 of the Option Agreement, American Can Company's option to renew the Lease was conditioned on American Can Company giving written notice of its exercise of the option on or before July 1, 1982. Prior to that notice date, American Can Company attempted to exercise its options under the Option Agreement to renew the Lease for an additional ten year period at $107,700.00 per year. This renewal term would cover the period February 1, 1987, through January 31, 1997.

12. On August 11, 1982, Justine filed a lawsuit for forcible entry and detainer in the Circuit Court of Cook County, Illinois, against American Can Company and four of its subtenants at the Elk Grove Village Property. Justine alleged that physical changes made to the premises during American Can Company's tenancy constituted "structural alterations" requiring the prior written consent of Justine, which consent had never been obtained. Justine also alleged that American Can Company had breached the Lease by failing to obtain Justine's prior written consent to four subleases. Justine sought possession of the Elk Grove Village Property and damages.

13. Two months later, American Can Company filed a lawsuit against Justine in the Circuit Court of Cook County, Illinois. In its lawsuit, American Can Company alleged that it had exercised the option to extend the Lease for a ten year period at a yearly rental of $107,700.00 beginning February 1, 1987, and ending January 31, 1997,

and sought specific performance of the option.

14. Justine's lawsuit went to trial first. At the close of Justine's case, the trial court entered judgment for American Can Company. Justine appealed that verdict to the Appellate Court of Illinois. The Appellate Court affirmed the trial court's ruling that physical changes to the building did not constitute "structural alterations" under the Lease, but reversed the trial court's directed verdict against Justine on the subleasing issue. The Appellate Court remanded the case to the trial court on the subleasing issue "with directions to proceed as though defendant's motion had been denied by the trial court or waived." This decision by the Appellate Court in *Justine Realty Co. v. American Can Co.* is reported at 119 Ill.App.3d 582, 75 Ill.Dec. 50, 456 N.E.2d 871 (1983), a copy of which is attached hereto as Exhibit 4.

### Settlement of the Two Lawsuits

15. During the pendency of these two lawsuits and approximately one year after the Appellate Court remanded Justine's lawsuit, Justine and American Can Company reached a settlement of all disputes on December 4, 1984.

16. As explained below, the settlement of the two lawsuits (one in which Justine was the plaintiff and the other in which American Can Company was the plaintiff) is set forth in two documents: a Settlement Agreement and Release (attached hereto as Exhibit 5) and Lease Amendment No. 5 (attached hereto as Exhibit 6).

17. In settlement of all claims arising out of the two lawsuits, Justine insisted that it be paid $215,400.00 per year for the ten year term set forth in the Option Agreement. A yearly payment of $215,400.00 is equal to the yearly rental on the Elk Grove Village Property prior to the renewal term. The renewal option that American Can Company attempted to exercise would have reduced the yearly rent to $107,700.00 beginning February 1, 1987, and ending January 31, 1997.

18. Justine initially proposed that the disputes be settled by continuing the Lease in effect from February 1, 1987, through January 31, 1997, but setting the yearly rental payment at $215,400.00, in effect granting the extension under the Option Agreement but not reducing the yearly rental.

19. American Can Company rejected this proposal because it wanted the Option Agreement yearly rental of $107,700.00. American Can Company was reluctant to amend the Lease to increase the Lease payments because such an amendment would have required the consent of one or more subtenants on the Lease. As an alternative, American Can Company proposed an agreement, separate from the Lease, whereby American Can Company would pay Justine an additional $107,700.00 per year for the same ten year period as found in the Option Agreement. Under this proposal, American Can Company would be granted the option on the Lease for ten years at $107,700.00 per year and American Can Company would pay Justine an additional sum per year pursuant to a separate Settlement Agreement.

20. Settlement of both lawsuits resulted in Amendment No. 5 to the Lease, extending the Lease through January 31, 1997, at $107,700.00 per year, and the Settlement Agreement and Release paying Justine a sum Justine deemed the equivalent of $107,700.00 per year during the Lease extension term, according to the schedule in paragraph 23, infra.

21. Specifically, under paragraph 1 of Amendment No. 5 to the Lease, the parties acknowledged that American Can Company had "exercised its option to renew the Lease for an additional ten (10) year period pursuant to paragraph 2 of the [Option Agreement]" and the parties agreed "that the expiration date of the term of the Lease [was] extended to January 31, 1997." The yearly rental during the ten year renewal period would be $107,700.00, as provided in paragraph 2 of the Option Agreement (quoted above).

22. Under the Settlement Agreement and Release, (a) the parties agreed to execute Amendment No. 5 to Lease, (b) Justine agreed to dismiss its lawsuit with prejudice, (c) American Can Company agreed to dismiss its lawsuit with prejudice, (d) each party gave the other a release of all claims asserted in their respective lawsuits, and (e) American Can Company agreed to pay Justine monthly payments for ten years beginning on February 15, 1987. These monthly payments were separate from the monthly payments under the lease.

23. As provided in Section IV.A of the Settlement Agreement and Release, American Can Company's monthly payments to Justine increased over ten years as follows:

| Time Period | Monthly Rate | Total Annual Payment |
|---|---|---|
| 2/15/87 thru 1/15/88 | $ 7,691.67 | $ 92,300.04 |
| 2/15/88 thru 1/15/89 | 7,691.67 | 92,300.04 |
| 2/15/89 thru 1/15/90 | 7,691.67 | 92,300.04 |
| 2/15/90 thru 1/15/91 | 9,358.33 | 112,299.96 |
| 2/15/91 thru 1/15/92 | 9,358.33 | 112,299.96 |
| 2/15/92 thru 1/15/93 | 9,358.33 | 112,299.96 |
| 2/15/93 thru 1/15/94 | 9,358.33 | 112,299.96 |
| 2/15/94 thru 1/15/95 | 11,025.00 | 132,300.00 |
| 2/15/95 thru 1/15/96 | 11,025.00 | 132,300.00 |
| 2/15/96 thru 1/15/97 | 11,025.00 | 132,300.00 |
| | Total | $1,122,999.96 |

24. The increasing payment schedule rather than a fixed $107,700.00 per year was suggested by American Can Company to allow lower payments in the early years. Justine agreed to this schedule because it still provided Justine with an amount Jus-

tine deemed the equivalent of $107,700.00 per year when averaged over the ten year period.

### Chain of Succession from American Can Company to American National Can Company

25. On November 10, 1986, Justine consented to American Can Company's assignment of the Lease to American Can Packaging, Inc.

26. In the spring of 1987, American Can Packaging, Inc., merged with National Can Corporation to form defendant American National Can Company, which assumed American Can Packaging, Inc.'s rights and obligations under the Lease and the Settlement Agreement and Release.

### Section IV of the Settlement Agreement and Release

27. Section IV of the Settlement Agreement and Release contains two provisions concerning the consequences of a late payment. Subsection A of Section IV provides, in pertinent part, for an acceleration of all remaining payments as follows:

> In the event that Justine does not receive a monthly payment before the twentieth day of the month in which the payment is due, Justine shall give American written notice thereof by certified mail return receipt requested, and if Justine has not received such payment within twelve days after receipt of such notice by American, the full amount of all remaining payments under this paragraph shall become immediately due, payable and collectible, without notice, and American shall pay Justine all Justine's costs of collection including reasonable attorneys' fees.

Subsection B of Section IV provides for an assessment of a late payment interest charge as follows:

> Each monthly payment that is payable pursuant to Paragraph IV.A hereof that is not paid when due shall bear interest at an annual rate equivalent to the prime rate, described in the *Wall Street Journal* as the base rate on corporate loans at large U.S. money center commercial banks, on the due date of such payment. Interest charges shall begin to run from the first date upon which Justine gives oral notice to or written notice is received by the real estate manager of American, or other employee in American's real estate department in the real estate manager's absence, that any payment hereunder has not been received, and shall accrue only for the days that the payment remains unpaid. For the purposes of this Paragraph IV.B only, notice may be oral or telephonic but if said notice is oral or telephonic, it shall thereafter be confirmed in writing by Justine to the real estate manager of American. Any payment of interest hereunder shall be payable by American to Justine at the time the payment is due for the next month following the month in which the interest charge accrued.

### The Immediate Events Giving Rise to This Lawsuit

28. American National failed to pay Justine the $7,691.67 payment when due on February 15, 1988.

29. On February 16, 1988, Justine sent American National a letter stating as follows:

> This is to confirm our telephonic notice to you, on this date, that pursuant to paragraph IV.A of the above agreement, American [National] is in default of the February 15, 1988, settlement payment in the amount of $7,691.67.
>
> Upon receipt of the payment, we shall notify American [National] of the amount of interest due which will be payable with the March 15, 1988, payment.

30. On February 22, 1988, Justine sent American National a letter by certified mail stating as follows:

> This is the notification provided for in paragraph IV.A of the above agreement,

that the monthly payment for February, 1988, has not been received.

31. American National received the February 22 letter on February 29, 1988.

32. Under Section IV.A of the Settlement Agreement and Release, American National had 12 days from February 29, 1988 (*i.e.*, through March 12, 1988) to pay Justine to avoid triggering the acceleration provision of the Settlement Agreement and Release.

33. Justine received the payment on March 17, 1988, five days after the deadline of March 12, 1988.

34. By certified letter dated March 18, 1988, Justine demanded payment of all remaining settlement amounts under the Settlement Agreement and Release. As of that date, the remaining settlement payments through January of 1997 totaled $1,030,699.92.

35. As stated above, Justine gave American National telephonic notice of late payment on February 16, 1988. Therefore, under Section IV.B (quoted above) interest on that late payment ran from that date until the payment was received on March 17, 1988 (*i.e.*, 30 days).

*Payments Since March 17, 1988*

36. Justine rejected American National's late payment of the $7,691.67 on March 17, 1988.

37. For several months thereafter, Justine rejected each monthly payment tendered by American National, contending it was owed all remaining payments by operation of the acceleration clause in Section IV.A.

38. On May 10, 1988, Justine filed this lawsuit seeking as damages the amount of all remaining payments accelerated under Section IV.A of the Settlement Agreement and Release. Justine alleged that the total amount of payments accelerated from February 15, 1988, through January 15, 1997, was $1,030,699.92. Justine also seeks interest on the accelerated amount and costs of collection, including reasonable attorneys' fees.

39. On March 20, 1989, the parties executed a letter agreement in which Justine acknowledged receipt of two checks from American National, one in the amount of $107,683.38 and the other in the amount of $5,659.39. The check for $107,683.38 represented all payments from February 15, 1988, through March 15, 1989, under the Settlement Agreement and Release. The payment of $5,659.39 represented interest on the monthly payments during that period, calculated in accordance with Section IV.B of the Settlement Agreement and Release. A copy of the letter agreement is attached as Exhibit 7.

40. As stated in that letter agreement of March 20, 1989, Justine's acceptance of those amounts and its acceptance of any future monthly payments made pursuant to the Settlement Agreement and Release "will not waive, release or modify in any way whatsoever (other than credit being given to American National Can Company for the total paid against any eventual recovery, if any), Justine's claims in the above-referenced lawsuit that American National Can Company breached the Settlement Agreement and Release when it failed to make the February 15, 1988, payment within the time provided in the Settlement Agreement and Release, or any other rights which Justine may have."

41. Under Section IV.B of the Settlement Agreement and Release, the calculated interest charge on the February 15, 1988, late payment (which Justine received on March 17, 1988) was $70.51. Justine has accepted payment of that interest charge under the letter agreement as part of the $5,659.39 paid by American National.

42. Since March 20, 1989, American National has tendered to Justine and Justine has accepted each of the monthly payments under the Settlement Agreement and Release.

43. Absent an acceleration, the total payments owed to Justine from February 15, 1990, through January 15, 1997, is $846,099.84 calculated as follows:

| Year | Monthly Rate | Total Annual Payment |
|---|---|---|
| 2/15/90 thru 1/15/91 | $ 9,358.33 | $112,299.96 |
| 2/15/91 thru 1/15/92 | 9,358.33 | 112,299.96 |
| 1/15/92 thru 1/15/93 | 9,358.33 | 112,299.96 |
| 1/15/93 thru 1/15/94 | 9,358.33 | 112,299.96 |
| 1/15/94 thru 1/15/95 | 11,025.00 | 132,300.00 |
| 1/15/95 thru 1/15/96 | 11,025.00 | 132,300.00 |
| 1/15/96 thru 1/15/97 | 11,025.00 | 132,300.00 |
| | Total | $846,099.84 |

## II. CONCLUSIONS OF LAW

Jurisdiction and venue are proper before this Court.[1]

 The sole issue in the case at bar is whether the acceleration clause in the parties' settlement agreement is enforceable under Illinois law.[2] Under Illinois law, a contractual provision that attempts to liquidate damages in the event of a breach is valid if the contractual damage amount is a reasonable estimate of the amount necessary to compensate the non-breaching party in the event of a breach, and the provision is not a penalty. *See generally, Lake River Corp. v. Carborundum Company,* 769 F.2d 1284, 1289–1293 (7th Cir.1985); *M.I.G. Investments, Inc. v. Marsala,* 92 Ill.App.3d 400, 47 Ill.Dec. 265, 270–71, 414 N.E.2d 1381, 1385–86 (1981). If a "liquidated damages" clause entitles the non-breaching party to more than compensation, it is a penalty. *Lu–Mi–Nus Signs, Inc. v. Jefferson Shoe Stores, Inc.,* 257 Ill.App. 150, 154 (1930). The Seventh Circuit has summarized the appropriate inquiry under Illinois law as follows:

> To be valid under Illinois law a liquidation of damages must be a reasonable estimate at the time of contracting of the likely damages from breach, and the need for estimation at that time must be shown by reference to the likely difficulty of measuring the actual damages from a breach of contract after the breach occurs. If damages would be easy to determine then, both the estimate greatly exceeds a reasonable upper estimate of what the damages are likely to be, it is a penalty.

*Lake River Corp.,* 769 F.2d at 1289–90 (1981) (citing *M.I.G. Investments,* 92 Ill. App.3d 400, 47 Ill.Dec. 265, 270, 414 N.E.2d 1381, 1386 (1981)).

The Seventh Circuit has also held with regard to Illinois law:

> When a contract specifies a single sum in damages for any and all breaches even though it is apparent that all are not of the same gravity, the specification is not a reasonable effort to estimate damages; and when in addition the fixed sum greatly exceeds the actual damages likely to be inflicted by a minor breach, its character as a penalty becomes unmistakable.

*Lake River Corp.,* 769 F.2d at 1290.

"[I]f the purpose of the clause fixing damages is merely to secure a party's performance, it will be treated as a penalty and only actual damages can be recovered." *H & M Driver Leasing Services, Unlimited, Inc. v. Champion International Corp.,* 181 Ill.App.3d 28, 129 Ill.Dec. 808, 810, 536 N.E.2d 858, 860 (Ill.App.1989) (citing *Scofield v. Tompkins,* 95 Ill. 190 (1880)). Illinois courts resolve doubtful cases in favor of classification as a penalty. *Lake River Corp.,* 769 F.2d at 1290.

In ruling on defendant's earlier motion to dismiss, this Court opined, on the basis of the facts before it, that the relationship between plaintiff and defendant was most closely akin to that of creditor and debtor. This conclusion was based on the assump-

---

**1.** This Court determined that jurisdiction and venue were proper before this Court in its October 10, 1989, order and memorandum.

**2.** This Court determined that Illinois law was applicable in its order and memorandum of October 10, 1989.

tion that defendant had agreed to pay plaintiff a sum certain, which had been broken down into periodic payments that included interest. Because this Court was ruling on a motion to dismiss, however, it was bound to view the facts in the light most favorable to the plaintiff. *Scheur v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1984). In the case's current posture, however, the Court sits as the finder of the fact and is bound to apply the law of Illinois faithfully to said facts.

The parties reveal in their stipulation that although they took great pain in drafting the settlement agreement to reflect that the monthly payments were not to be formally incorporated into the lease agreement, the payments were, in fact, meant to serve as supplemental lease payments. (Findings of Fact ¶¶ 18 through 20.) Thus, the payments in question cannot properly be characterized as installments on a loan. The parties did not agree to a single sum of money, which defendant would pay gradually, with interest, over an extended period of time. Rather, the monthly payments in question are most *closely* akin to lease payments.

Based on this understanding of the parties' agreement, this Court finds that the case of *Tiernan v. Hinman*, 16 Ill. 400 (1854), controls the resolution of this matter. The court, in *Tiernan v. Hinman*, considered a mortgage deed providing that the purchaser of certain property was to pay $400.00 on the first day of July in 1853, $850.00 on the first day of July in 1854, $751.50 on the first day of July in 1855 "and the same sum annually thereafter for the years 1856, 1857, 1858 and 1859, without interest." *Id.*, 16 Ill. at 401. The mortgage deed provided that if any installment was not paid when due, then every outstanding installment would immediately become due, and the seller could sell the mortgaged property. The buyer made a late payment, and the seller sought to enforce the acceleration clause in the mortgage deed. The *Tiernan* court held that the acceleration clause constituted an invalid penalty and found that the seller was only entitled to the installment due, plus any interest that had accrued. *Id.*, 16 Ill. at 401–402. The court reached its conclu-

sion by reasoning that the seller was entitled to be placed in the same condition he would have been in had the installment been paid when due. The court noted that if the seller was allowed to accelerate the payments, the buyer would forfeit the use of the money representing future installments. The court observed that when "a greater sum of money is to be paid, upon default in the payment of a lesser sum at a given time, both courts of law and equity will hold the provision for the payment of the greater sum to be a penalty." *Id.* at 402. Therefore, the court concluded that the acceleration clause was a penalty, and was, therefore, invalid.

Although the *Tiernan* decision is somewhat dated, it is still good law in Illinois. Furthermore, the rationale in the Seventh Circuit's more recent decision in *Lake River Corp. v. Carborundum Company*, 769 F.2d 1284 (7th Cir.1985), would demand the same result. Under *Tiernan*, the acceleration clause in the parties' contract must be viewed as a penalty, and it is, therefore, invalid. Furthermore, plaintiff concedes that the purpose of the acceleration clause is to secure defendant's performance, which also necessitates that the clause be invalidated under Illinois law. Accordingly, this Court finds that plaintiff is only entitled to the payment due under the regular terms of the contract, plus any interest due thereon. In light of the fact that the late payment and interest thereon at the contractually agreed upon rate has been tendered to and accepted by plaintiff, and given that defendant has complied with the payment schedule since February, this Court finds that plaintiff shall take nothing in this cause of action. Accordingly, judgment will be entered in favor of defendant.