MEMORANDUM OPINION AND ORDER
 

 BUCKLO, District Judge.
 

 Plaintiff Lawyers Title Insurance Corporation (“Lawyers Title”) has obtained a default judgment against one of the defendants, Dearborn Title Corporation (“Dearborn”). Lawyers Title has subsequently attempted to collect money from third parties who owe money to Dearborn in order to satisfy that judgment. Pursuant to Federal Rule of Civil Procedure 69(a), Lawyers Title served a Citation to Discover Assets on United Financial Mortgage Corporation (“UFMC”). Lawyers Title’s motion for a turnover order followed, and both Lawyers Title and UFMC have now filed motions for summary judgment with respect to the turnover order. For the reasons explained below, UFMC’s motion is denied, and Lawyers Title’s motion is granted in part and denied in part.
 

 Background
 

 Lawyers Title underwrites title insurance. It entered into an Agency Agreement with Dearborn, under which Dearborn would act as Lawyers Title’s agent in issuing title insurance policies in Illinois. Dearborn also acted as a closing escrow agent pursuant to written closing escrow agreements with various mortgage lenders and their respective borrowers in connection with real estate transactions. As a closing escrow agent, Dearborn established an escrow account into which lenders would transfer the funds to be used to fund mortgages. Dearborn also received and held as a custody agent the documents and instruments evidencing the transactions. Before each closing, the lender would deliver the loan proceeds and closing documents to Dearborn with specific instructions for disbursing the money. Dearborn, acting as the mortgage lender’s agent, held the money in trust until it was used to discharge all prior liens and encumbrances at the time of closing. Additionally, Dearborn implemented the execution and recordation of necessary documents necessary to complete the real estate transaction.
 

 Eileen Rasulis was the President of Dear-born, and she did not run Dearborn well. According to Lawyers Title, Dearborn fraudulently mishandled money entrusted to it as an escrow agent, creating a shortfall in the escrow account exceeding $5,000,000. Lawyers Title has subsequently reimbursed people who lost the funds they entrusted to Dearborn. Lawyers Title then brought this suit against Dearborn, Rasulis, and other entities who allegedly had a hand in Dear-born’s fraud, to recover the money it has had to pay for the insurance claims.
 

 When Dearborn, which collapsed in May, 1994, failed to answer the complaint, Lawyers Title obtained a default judgment against it in excess of $5.9 million. Because Dearborn does not have assets to pay the judgment, Lawyers Title has tried to recover assets belonging to Dearborn from third parties. Many third parties have willingly complied, turning over to Lawyers Title money they had mistakenly received from Dearborn. UFMC, one of the lenders who used Dear-born as its closing escrow agent, has not been so cooperative, necessitating this litigation. Lawyers Title served a Citation to Discover Assets on UFMC, and found two Dearborn transactions with UFMC in which it appears that UFMC holds funds belonging to Dearborn.
 

 First, Lawyers Title claims that UFMC owes Dearborn $87,800 pursuant to a refinancing loan procured by Jesus and Elizabeth Larios (“the Larios Money”). UFMC had committed to deliver to Dearborn $87,-800 to be used to pay off the Larios’ prior lenders and other creditors. UFMC admits that it never funded the refinance, however,
 
 *615
 
 and that it therefore owes Dearborn $87,800. Second, Lawyers Title points to a Dearborn check to UFMC made out for $565,649.26 which UFMC cashed in January, 1994 (“the Debt-Repayment Check”). UFMC concedes that this check does not relate to any particular transaction. UFMC’s president, Joseph Khoshabe, testified that this check was issued in satisfaction of various debts that Dearborn had owed to UFMC.
 

 In June, 1995, Lawyers Title had UFMC’s bank freeze $565,649.26 in UFMC’s bank account. Lawyers Title then filed a motion for a turnover order and these two motions for summary judgment regarding the turnover order and garnishment action followed.
 

 Lawyers Title’s Right to Recover
 

 Illinois law governs this action.
 
 See
 
 Fed.R.Civ.P. 69(a). . Because Lawyers Title is a judgment creditor of Dearborn, under Illinois law, “[i]f [Lawyers Title] can show [that UFMC] has property of ... [Dearborn], the court is empowered ... to compel [UFMC] to deliver up any assets so discovered or the value thereof, if those assets are held under circumstances in which [Dearborn] could recover them in an appropriate action.”
 
 Bentley v. Glenn Shipley Enterprises, Inc.,
 
 248 Ill.App.3d 647, 619 N.E.2d 816, 819, 189 Ill.Dec. 115, 118 (4th Dist. 1993).
 
 [1]
 
 Illinois courts would not require that Dearborn have fraudulently transferred the assets to UFMC. Instead, “[i]t is enough that [Dearborn] has the right to recover the assets from [UFMC].” Id.
 
 [2]
 

 UFMC correctly notes that Lawyers Title bears the burden of proving that UFMC holds funds that Dearborn could recover. With respect to the Larios money, Lawyers Title has met this burden because UFMC concedes that it never funded the Larios transaction. UFMC still has not paid the Larios money to Dearborn (or Lawyers Title), however, because UFMC claims a right to set off its claims against Dearborn with that money.
 
 See
 
 735 ILCS 5/12-708 (explaining garnishee’s right to setoff).
 

 Lawyers Title has also met its burden with respect to the Debt-Repayment Cheek for $565,649.26. UFMC admits that this check is not identified with any specific transaction between Dearborn and UFMC. In fact, UFMC admits that Dearborn did not give UFMC the check for any specific purpose. Khoshabe testified only that Dearborn issued the cheek as payment for several debts Dearborn owed to UFMC, and offered two examples.
 

 First, Khoshabe testified that Dearborn owed UFMC $255,000 pursuant to an agreement whereby any time a Dearborn check to UFMC bounced, Dearborn would not only replace the cheek, but also pay damages in the full amount of the check. Khoshabe points to two cheeks, one for $190,000 and one for $65,000, which Dearborn bounced. UFMC says that Dearborn owed it $255,000 for these bounced checks (in addition to the $255,000 already paid to UFMC to replace the bounced checks). UFMC’s answer, even if accepted as true, however, would not justify the Dearborn check for $565,649.26. Moreover, when asked' in his deposition whether the $565,649.26 cheek included the $255,000 double payment penalty, Khoshabe answered “I don’t know.” (Khoshabe Dep. at 162-63). Thus although UFMC contends that Khoshabe’s testimony supports its contention that the cheek included payments pursuant to this double-for-bounced-ehecks deal, it clearly does not.
 
 [3]
 

 
 *616
 
 Khoshabe also testified that the $565,-649.26 check included reimbursement for a “facilities charge.” UFMC says that Dear-born and UFMC had an agreement that Dearborn could conduct closings at UFMC offices. In exchange for that right, Dear-born agreed to pay UFMC $100 for each closing taking place at UFMC offices in which UFMC was not the lender, and $300 for each closing at a UFMC office in which UFMC was the lender. According to UFMC, as of the date of the $565,649.26 check, Dearborn owed it approximately $200,000 in facilities charges. Again, if I accept UFMC’s contention as the truth, the $200,000 facilities charge tab still does not justify the $565,649.26 check. Even if I add the bounced cheek debt and the facilities charge debt together, I do not find a debt of Dearborn equal to the $565,649.26 check. UFMC offers no other explanation for why Dearborn would write it a check for this amount.
 

 In sum, UFMC has conceded that Dear-born did not give UFMC a check for $565,-649.26 as payment for any specific transaction. UFMC’s two explanations for the cheek, even if accepted as lawful and true, would not account for the amount of the check since together they add up to only $455,000.
 

 UFMC’s Right to Setoff
 

 Dearborn claims that it has a right to keep the money as a setoff against its claims against Dearborn. As the party declaring a right to setoff, UFMC bears the burden of proving its claims against Dearborn.
 
 See, e.g., Allahar v. Zahora,
 
 59 F.3d 693, 696 (7th Cir.1995) (putting burden on defendant to prove affirmative defense). UFMC claims three categories of moneys it would be entitled to claim from Dearborn.
 

 First, UFMC claims that Dearborn owes it double payment for the two cheeks it bounced, pursuant to the agreement between Dearborn and UFMC that whenever Dear-born bounced a check, it would not only replace the check but also pay the amount of the check again.
 
 [4]
 
 Lawyers Title initially argues that UFMC has not proven that Dear-born and UFMC ever had such a contract. While it is true that there is no documentary evidence of the contract, Khoshabe’s testimony presents enough evidence of the contract to preclude summary judgment — a jury could decide whether Khoshabe’s testimony alone adequately proves that the contract was made.
 

 Lawyers Title next argues that even if Dearborn and UFMC made such a contract, it would not be enforceable because the double payment constitutes an unenforceable penalty. Illinois continues to recognize a distinction between liquidated damages and penalties, enforcing the former but not the latter.
 
 See Lake River Corp. v. Carborundum Co.,
 
 769 F.2d 1284, 1288-1290 (7th Cir. 1985) (citing Illinois cases and questioning the wisdom of refusing to enforce “penalty” clauses). In Illinois, to be a valid and enforceable liquidated damages clause, actual damages must be difficult to ascertain and the liquidated damages amount must be a reasonable estimate of the damages that would actually result if the contract were breached.
 
 See, e.g., Calumet Construction Corp. v. Metropolitan Sanitary District of Greater Chicago,
 
 178 Ill.App.3d 415, 533 N.E.2d 453, 455, 127 Ill.Dec. 581, 583 (1st Dist.1988);
 
 M.I.G. Investments, Inc. v. Marsala,
 
 92 Ill.App.3d 400, 414 N.E.2d 1381, 1385, 47 Ill.Dec. 265, 269 (2d Dist.1981).
 

 Whether a contractual damages provision constitutes an unenforceable penalty clause or should be enforced as liquidated damages is a question of law.
 
 Lake River,
 
 769 F.2d at 1290. I find that the agreement to pay double for a bounced check operates as a penalty and therefore cannot be enforced. Although actual damages on Dear-born’s failure to properly pay money due to UFMC may have been difficult to predict, an amount equal to the amount of the check does not reasonably estimate the damages UFMC would be likely to suffer. Dearborn would have to wait an extremely long time to
 
 *617
 
 replace a bounced check before UFMC would be entitled to interest of 100 percent. Where “the [damages] estimate greatly exceeds a reasonable upper estimate of what the damages are likely to be, it is a penalty.”
 
 Marsala,
 
 414 N.E.2d at 1386, 47 Ill.Dec. at 270. Moreover, Illinois courts resolve doubtful eases in favor of classifying them as penalties.
 
 Lake River,
 
 769 F.2d at 1290 (citing Illinois cases). Thus even if I were to find this case a close one, which I do not, I would still not enforce it as a penalty.
 

 UFMC cites cases holding that the court should give effect to the parties’ intention.
 
 [5]
 
 The point of the liquidated damages-penalty distinction, however, is that Illinois courts do not enforce parties’ agreements to pay penalties, even if the parties intend to enter into them.
 
 Lake River,
 
 769 F.2d at 1289.
 

 UFMC also claims a setoff pursuant to its facilities charge agreement. According to UFMC, Dearborn owes it $300 for each of 629 closings Dearborn held at UFMC offices in 1993 and the first quarter of 1994 (for a total of $188,700), for which UFMC was the lender. UFMC says also that Dearborn owes it $30,000, based on $100 for each of 75 Dearborn closings held at UFMC that did not involve UFMC as the lender that occurred on average every four months. As with the bounced check agreement, Lawyers Title first argues that it is entitled to summary judgment because UFMC has no documentary evidence, of the agreement. Khoshabe’s testimony, however, presents enough evidence to allow UFMC to withstand summary judgment — I cannot say as a matter of law that Khoshabe is not to be believed and that Dearborn and UFMC never had such an agreement.
 

 Lawyers Title next argues that even if Dearborn and UFMC had such an agreement, the Statute of Frauds precludes enforcing it because it was not made in writing. Under the Statute of Frauds, a plaintiff may not sue to enforce an unwritten contract if it is not to be performed within one year.
 
 See
 
 740 ILCS 80/1. The parties dispute whether the Statute of Frauds bars enforcement of contracts that
 
 could
 
 terminate within one year (as this one could) or only contracts that
 
 could not
 
 terminate within one year and whether Lawyers Title, as Dearborn’s judgment creditor, has standing to raise the defense. I need not resolve these issues, however, because “[i]n Illinois, an oral contract is not unenforceable under the Statute of Frauds if the contract has been performed completely by one party.”
 
 Jesmer v. Rohlev,
 
 241 Ill.App.3d 798, 609 N.E.2d 816, 822, 182 Ill.Dec. 282, 288 (1st Dist.1993). Here, under UFMC’s version of the facts, UFMC has performed its contractual duties by allowing Dearborn to conduct closings at its offices. Lawyers Title (Dearborn) cannot now avoid performing its end of the bargain by claiming the Statute of Frauds as a defense.
 

 Lawyers Title next argues that the facihties charge agreement can not be enforced because it violates the Real Estate Settlement Procedures Act of 1974 (“RES-PA”), 12 U.S.C. § 2601
 
 et seq.
 
 Section 2607(a) provides that “[n]o person shaU give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.”
 
 See also
 
 24 C.F.R. § 3500.14(b). Lawyers Title argues that Dearborn’s agreement to pay $100 to conduct a non-UFMC closing, but $300 for a UFMC closing, at a UFMC office constituted an illegal kickback scheme.
 

 
 *618
 
 UFMC responds by arguing that these payments are lawful under section 2607(c) which provides that “[njothing in this section shall be construed as prohibiting ... the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed.” Under this section of the statute, compensation for allowing Dear-born to hold closings at UFMC offices is legal under RESPA. UFMC is therefore entitled to have a jury decide whether Dear-born agreed to pay UFMC rent to use its facilities.
 

 The problem with the agreement as explained by UFMC, however, is that Dearborn allegedly agreed to pay UFMC $200 more for each closing in which UFMC was the lender. I agree with Lawyers Title that this extra payment of $200 must be viewed as an improper referral fee because UFMC did nothing to earn the extra money. UFMC offers no explanation for charging Dearborn more to conduct a UFMC closing at UFMC’s offices than it charged Dearborn to conduct a non-UFMC closing.
 
 [6]
 
 In response to Lawyers Title’s assertion in its Rule 12(M) statement that “United Financial did nothing to earn the $200 difference,” UFMC said only that “it permitted Dearborn to use its offices for closing purposes; that [UFMC] permitted Dearborn to be listed on its building directory and that it supplied Dearborn with a key to its facilities.” UFMC does not explain how providing Dearborn with a key to its facilities or listing it on the directory justified charging Dearborn three times as much to hold a UFMC closing at UFMC’s offices. UFMC’s statement simply does not address the distinction between the two prices charged. I therefore find, as a matter of law, that the extra $200 Dearborn paid UFMC for UFMC closings constituted an illegal kickback and therefore UFMC may not base its setoff claim on those payments.
 
 [7]
 

 Finally, UFMC asserts that it is entitled to keep the money as a setoff for its claims against Dearborn and Lawyers Title for Dearborn’s negligence. These claims include damages for “lost loan locks,” extra interest UFMC allegedly had to pay on its warehouse line of credit resulting from Dearborn’s failure to timely remit closing proceeds to UFMC, and damages from lost loan documents. UFMC, however, presents no evidence to prove any of these claims.
 

 For example, UFMC claims that it is entitled to damages of $78,149.50 for lost loan locks. As support for this contention, UFMC points to Khoshabe’s testimony that he had discussed the blown lock damages with Rasulis and she had agreed that Dear-born owed UFMC money for those damages. UFMC also points to two lists it compiled entitled “Loss on Files Due to Dearborn Title Negligence.” The lists appear to provide the names of files, Dearborn’s mistakes, and the amount lost on each file. UFMC offers no proof to substantiate either list, however, nor even an explanation for what the terms in the lists mean or how it developed the lists. The transactions on the lists are not even dated. I find that neither the two lists nor Khoshabe’s testimony allows UFMC to withstand summary judgment on this issue. “Summary judgment is properly granted when a non-movant fails to produce any proof to establish an element essential to the party’s case and upon which the party will bear the burden of proof at trial.”
 
 Bell v. Purdue University,
 
 975 F.2d 422, 430 (7th Cir.1992) (citing
 
 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). Because UFMC has come forward with inadequate proof of its claim to over $78,000 in damages for lost loan locks, Lawyers Title is entitled to summary judgment on this claim.
 

 
 *619
 
 To support its claim that Dearborn owes it money for extra interest it had to pay on its warehouse line of credit, UFMC cites solely to Khoshabe’s testimony. Khoshabe testified only that he had discussed the extra interest damages with Rasulis. He admitted that at the time he did not know exactly what UFMC’s damages were, but by the time of his deposition, he had estimated that Dear-born owed UFMC “somewhere around about 50 to 60,000, maybe more.” UFMC also says that Khoshabe and Rasulis agreed that Dear-born owed UFMC $38,209.74 for extra interest, and cites to an affidavit from Khoshabe with handwritten notes attached. UFMC offers no proof of its damages other than Khoshabe’s testimony that he calculated that Dearborn owed UFMC $38,209.74. UFMC provides no basis for Khoshabe’s calculation and consequently I conclude that a reasonable jury could not decide in UFMC’s favor on this issue.
 

 Finally, UFMC says that it holds loan files which are missing documents due to Dearborn’s negligence. UFMC contends that it “could be subject to repurchasing hundreds of thousands of dollars worth of loans as a result of delinquent documents from Dearborn.”
 
 [8]
 
 To this point, however, UFMC has not had to buy back any loans and therefore has not suffered any damages due to the delinquent documents. It is not entitled to keep Dearborn’s money as a setoff for a claim that it does not have against Dearborn. Lawyers Title is therefore entitled to judgment as a matter of law on this issue.
 

 Conclusion
 

 I find that Lawyers Title has proven as a matter of law that the two amounts, $87,800 from the Larios transaction and $565,649.26 from the Debt-Repayment Check, could be recovered by Dearborn in an appropriate action and therefore Lawyers Title, as Dear-born’s judgment creditor, may collect those funds. I also find that UFMC has no right to setoff any claims it has against Dearborn for the bounced check-double payment agreement or for any damages allegedly due to Dearborn’s negligence. Finally, I find that the additional facilities charge for UFMC closings is an illegal kickback under RESPA and therefore the most UFMC could retain from the funds is $100 per transaction which closed at UFMC offices. UFMC is not entitled to summary judgment on this issue, however, because UFMC has not shown as a matter of law that it is entitled to those payments. Because the most UFMC would be entitled to retain under the facilities agreement is $100 per transaction for 704 (629 + 75) transactions, for a total of $70,400, the remaining funds must be turned over to Lawyers Title.
 

 [1]
 

 . The Illinois statute provides that the court may ''[cjompel any person cited ... to deliver up any assets ..., to be applied in satisfaction of the judgment, ... when those assets are held under such circumstances that in an action by the judgment debtor he or she could recover them.” 735 ILCS 5/2 — 1402(b)(3) (Smith-Hurd 1992).
 

 [2]
 

 . The parties devote much of their briefs to arguing whether Lawyers Title is a proper subrogee to Dearborn’s rights and whether Lawyers Title can prove that the money was given to UFMC as a fraudulent conveyance. Under Illinois law, neither point matters. Lawyers Title, as a judgment creditor of Dearborn, may recover the money from UFMC if Dearborn itself could, whether or not UFMC received the money in a fraudulent conveyance and whether Lawyers Title has subrogated to the rights of other people by paying their insurance claims.
 

 [3]
 

 . This agreement is not in writing, and UFMC has no evidence, besides Khoshabe’s testimony, that UFMC and Dearborn ever entered into such an agreement.
 

 [4]
 

 . UFMC contends that the $565,649.26 check included $255,000 in bounced check payments. Because I have decided that UFMC has not presented evidence showing that Dearborn already paid UFMC the $255,000, I treat UFMC’s claim under the bounced check agreement as a claim for a setoff against Lawyers Title’s request for the money.
 

 [5]
 

 . UFMC also alleges a scam undertaken by Dear-born in which Dearborn would receive and cash a check from UFMC, but then call and say that it never received the check. When UFMC subsequently issued a replacement check, Dearborn would cash that one too. After several months, UFMC caught Dearborn doing it twice, so Dear-born issued two replacement checks, both of which bounced. UFMC therefore asks me to consider how long Dearborn had the use of UFMC's money, to make the double-payment clause seem more reasonable. The agreement as alleged by UFMC, however, was not that Dear-born would pay double for any checks it bounced solely in connection with the alleged lost check scam, but that Dearborn would pay double for
 
 any
 
 check it bounced. The validity of the double damages agreement therefore must be weighed against Dearborn's propensity to bounce checks generally.
 

 [6]
 

 . In fact, common sense dictates that UFMC would be more likely to charge Dearborn
 
 less
 
 to conduct UFMC closings at UFMC's offices, as a convenience to UFMC and its customers.
 

 [7]
 

 . UFMC argues that Lawyers Title should be precluded from making this argument since Dearborn would be barred by RESPA's one-year statute of limitations from trying to recoup the extra $200 per transaction if it had already paid it.
 
 See
 
 12 U.S.C. § 2614. In the context of UFMC's right to a setoff, however, I need not decide whether an action by Dearborn would be barred by the statute of limitations, but only whether UFMC should be allowed to enforce the alleged agreement.
 

 [8]
 

 . Khoshabe testified that UFMC was potentially subject to damages from buy back notices, but that he was negotiating to avoid those losses.