THE PEOPLE *ex rel.* ROBERT L. DONAHUE, Chairman, Capital Development Board, Plaintiff-Appellant, *v.* PERKINS & WILL ARCHITECTS, INC., *et al.*, Defendants.—(TEMP-TECH INDUSTRIES, INC., Defendant-Appellee.)

First District (2nd Division)    No. 79-2385

Opinion filed November 5, 1980.

William J. Scott, Attorney General, of Chicago (Saul A. Epton, Special Assistant Attorney General, of Epton, Mullin, Segal & Druth, Ltd., of counsel), for appellant.

Arthur M. Solomon, and Vito M. Evola, of Griffin, Fiedler & Pascucci, Ltd., both of Chicago, for appellee.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Plaintiff State of Illinois has filed suit against four defendants, contractors and architects for a State facility, alleging numerous defects in the construction of that facility. In the instant appeal plaintiff challenges the pretrial dismissal of one defendant, Temp-Tech Industries, Inc. The trial court dismissed Temp-Tech, a window manufacturer, on the ground that Temp-Tech had not assumed the liabilities of T-O-W Industries, Inc., which had manufactured the allegedly defective windows installed in the State facility.

Prior to 1976, T-O-W Industries manufactured and sold insulated window glass under the trade name Therm-O-Window. T-O-W, in the course of its business, had supplied double pane windows for installation in the Howe Developmental Center, a mental retardation facility then under construction in Tinley Park. The windows subsequently formed condensation between the panes, rendering them translucent but not transparent.

During this period, T-O-W was experiencing financial difficulties. In August 1973, T-O-W had obtained a substantial loan from a group of six lenders. It is not clear from the record whether the loan came before or after the delivery of the defective windows. The record does indicate that T-O-W had received notice of the condensation problem by June 28, 1974. In the course of the loan transaction, the lenders obtained a security interest in all the assets of T-O-W, and caused Harold Wright, T-O-W's president and sole shareholder, to put his T-O-W stock in a voting trust. This device assured the lenders voting control of the corporation, but they did not immediately exercise this control.

T-O-W's fortunes continued to decline, and by mid-1975, the corporation was insolvent. The six lenders (five small business investment corporations and one individual) then used their voting power to install their own representatives as directors of T-O-W. The new directors ousted Harold Wright as president, and hired a new president (Thomas Reinhart) and controller (Frank Laikis). Unlike the new directors and the trustees of the voting trust, Reinhart and Laikis were not employees of the corporate lenders. By late 1975, it was clear that T-O-W would founder. The six lenders had a security interest in all the assets of T-O-W, but other

creditors (principally, glass suppliers) were unsecured. The lenders, again using the voting power afforded them by the voting trust, caused T-O-W's assets to be transferred to an assignee for benefit of creditors. This assignee, Bernard Chaitman, was independent of both the lending group and Harold Wright, T-O-W's sole shareholder. At the same time, the six lenders developed a plan to form a new corporation which would acquire T-O-W's equipment, and pay off the loan. To this end, Temp-Tech was formed on January 22, 1976. On February 3, 1976, Chaitman, as assignee, sold all of T-O-W's assets (excluding cash on hand) to Temp-Tech for $7500. (Plaintiff herein has not challenged the adequacy of this price, and we note that all assets were sold subject to the security interest.) Temp-Tech then began operations in the same plant formerly leased to T-O-W, employing T-O-W's former employees, and making the same products. Reinhart and Laikis managed Temp-Tech. The new corporation's initial shareholders were the six lenders, and its board of directors was composed of the individuals who had represented the lenders on T-O-W's board. Temp-Tech's operations proved profitable, and it continued to pay off the loan secured by its equipment. By June 1979, the lenders were no longer represented on Temp-Tech's board of directors, and other persons, outside of the lending group, had acquired some of Temp-Tech's stock.

Some time after the sale of its assets by the assignee, T-O-W's charter was revoked by the Secretary of State for failure to pay the franchise tax, and Harold Wright filed a personal bankruptcy action. Wright received nothing for his T-O-W stock, and never had any connection with Temp-Tech. Temp-Tech, although it made payments to T-O-W's secured creditors, never paid the unsecured creditors, who suffered substantial losses.

■■ The foregoing events are recounted in detail because they are relevant to the issue of whether Temp-Tech has succeeded to the liability of T-O-W for claims arising from windows manufactured by T-O-W. It is important to note that Temp-Tech's acquisition of T-O-W's business was accomplished by a purchase of T-O-W's assets from a third party, Chaitman. The general rule is that a corporation purchasing the assets of another corporation is not liable for the debts of the transferor corporation. (*Hernandez v. Johnson Press Corp.* (1979), 70 Ill. App. 3d 664, 666, 388 N.E.2d 778; *Alexander v. State Savings Bank & Trust Co.* (1935), 281 Ill. App. 88, 96.) There are four exceptions to this general rule: (1) where there is an express or implied agreement to assume the transferor's liabilities; (2) where the transaction amounts to a consolidation or merger of the two corporations; (3) where the transferee corporation is merely a continuation of the transferor corporation; and (4) where the transaction

is an attempt to defraud creditors of the transferor corporation. *Hernandez*, at 667; 15 W. Fletcher, Cyclopedia Corporations §7122, at 188-89 (1973).

■■ Plaintiff herein does not assert an express or implied assumption of liability, and does not claim that unsecured creditors were defrauded. Plaintiff's case relies on exceptions (2) and (3), above. Examining exception (2), if there was a merger between T-O-W and Temp-Tech, the merger must be held constructive or *"de facto,"* since the transaction bore none of the ordinary signs of a merger. The *Hernandez* case suggests what elements should be required for a *de facto* merger: (1) there should be a continuity of business operations between the transferor corporation and the transferee corporation, including continuity of management, employees, location, and assets; (2) there should be a continuity of shareholders, whereby shareholders of the transferor corporation exchange their ownership of the transferor corporation for shares of the transferee corporation; (3) the transferor corporation should cease operations and dissolve within a short time; (4) the transferee corporation then assumes those liabilities of the transferor corporation which are necessary for the continuation of normal business operations. *Herandez*, at 667.

■■■ In the instant case, continuity of shareholders is not present, since Wright, sole shareholder of T-O-W, acquired no interest in Temp-Tech. The six lenders who initially held all the Temp-Tech stock had no ownership interest in T-O-W's stock. The lenders did control the vote of the T-O-W stock by virtue of the voting trust, but a voting trust involves the separation of control and ownership, so ownership cannot be inferred from voting control. (See *Tankersly v. Albright* (N.D. Ill. 1974), 374 F. Supp. 538, 547, *rev'd in part on other grounds* (7th Cir. 1975), 514 F.2d 956; 5 W. Fletcher, Cyclopedia Corporations §2075, at 331 (1976).) If the six lenders had any ownership interest in T-O-W, it must be found in the security interest in T-O-W's assets. A security interest is a legal or equitable interest in property that secures the payment of a debt (see *Southern Surety Co. v. Peoples State Bank* (1928), 332 Ill. 362, 365, 163 N.E. 659, defining chattel mortgage, a predecessor of the Commercial Code's unified security interest (see Ill. Ann. Stat., ch. 26, par. 9—101, Uniform Commercial Code Comment (Smith-Hurd 1974))), but nothing in plaintiff's arguments persuades us that a security interest, or a security interest in combination with voting control, should create an interest equivalent to ownership of corporate stock. As a practical matter, we cannot ignore the fact that security interests and voting trusts are routine elements of corporate lending, and if this court were to reduce corporate creditors to the rank of shareholders as a penalty for use of these procedures, sweeping changes in corporate law could be implicated. While the other three requirements of the *"de facto* merger" test might

present issues of fact, a jury could not as a matter of law have found continuity of shareholders, so the "merger" exception to the general rule of nonliability does not apply.

■■ Plaintiff's alternate theory is that, under the third exception to the general rule, Temp-Tech is a "mere continuation" of T-O-W. No Illinois case sets out the components of a "mere continuation," but one commentator has observed that a continuation of one corporation in the person of another amounts to a corporate reorganization. (15 W. Fletcher, Cyclopedia Corporations §7122, at 189 (1973).) Reorganizations can take different forms, and have different effects on corporate creditors. A voluntary reorganization, undertaken by the shareholders without outside pressure, leaves the new corporation liable for the debts of the former corporation. (15 W. Fletcher, Cyclopedia Corporations §7305, at 516 (1973).) An involuntary reorganization, that is, one forced on the corporation by its creditors, usually taking the form of bankruptcy or foreclosure, ordinarily leaves unsecured creditors without recourse against the successor corporation. 15 W. Fletcher, Cyclopedia Corporations §7327, at 539 (1973).

In the instant case, the action of the lenders in assigning T-O-W's assets for benefit of creditors was the functional equivalent of foreclosure. In late 1975, given the impending demise of T-O-W, the lending group could have foreclosed on its security interest, in which event the unsecured creditors would have been left with little or nothing. Instead, the lenders caused a liquidation of T-O-W's assets through an assignment for benefit of creditors. This action enabled the lenders to preserve the value of T-O-W's assets by purchasing them in the name of a viable corporation. This method of involuntary reorganization was no more prejudicial to T-O-W's unsecured creditors than other available means. Under the circumstances, we find no reason to depart from the usual rule that involuntary reorganization extinguishes old debts. Further, we observe that the Illinois cases finding a new corporation a mere continuation of a former corporation all involve voluntary reorganizations. *E.g.*, *Bergman & Lefkow Ins. Agency v. Flash Cab Co.* (1969), 110 Ill. App. 2d 415, 420, 431-32, 249 N.E.2d 729; *Kraft v. Garfield Park Community Hosp.* (1938), 296 Ill. App. 613, 618-20, 16 N.E.2d 936; *Loughlin v. United States School Furniture Co.* (1905), 118 Ill. App. 36, 39, *aff'd sub nom. Perry v. United States School Furniture Co.* (1907), 232 Ill. 101, 83 N.E. 444.

· Plaintiff herein cites numerous cases, most of them from foreign jurisdictions, in support of his assertion that Temp-Tech is a "mere continuation" of T-O-W. Plaintiff points to the continuity of directors, employees, and facilities, and argues that these factors warrant a finding of "continuation," notwithstanding the lack of continuity of stock ownership. (See *Cyr v. B. Offen & Co.* (1st Cir. 1974), 501 F.2d 1145, 1154.)

Defendant, however, correctly points out that the lenders involved themselves in the control of T-O-W only to salvage their investment. On these facts, the lenders' actions with respect to T-O-W appear more a liquidation than a continuation. As in the "merger" issue treated above, plaintiff's arguments for "mere continuation" are not compelling without a finding that the equitable owners of the new corporation had an ownership interest in the former corporation. This issue has been treated above, and the conclusion reached there is equally applicable here.

We note further than many of the cases cited by plaintiff are product liability cases involving personal injury. Some States, discerning special public policy factors inherent in strict liability actions, have either broadened the "mere continuation" exception for these cases (*e.g.*, *Turner v. Bituminous Casualty Co.* (1976), 397 Mich. 406, 244 N.W.2d 873), or created a fifth exception, the product line exception (see *Ray v. Alad Corp.* (1977), 19 Cal. 3d 22, 34, 560 P.2d 3, 10-11, 136 Cal. Rptr. 574, 581-82). Thus far, Illinois courts have declined to apply the product line exception (*Barron v. Kane & Roach, Inc.* (1979), 79 Ill. App. 3d 44, 49, 398 N.E.2d 244; *Domine v. Fulton Iron Works* (1979), 76 Ill. App. 3d 253, 257, 395 N.E.2d 19; *Hernandez*, at 668; *Johnson v. Marshall & Huschcart Machinery Co.* (1978), 66 Ill. App. 3d 766, 770-71, 384 N.E.2d 141), and treatment of the issue in these cases suggests that Illinois courts will decline to give strict tort liability cases special treatment on issues of successor corporate liability. Accord, 15 W. Fletcher, Cyclopedia Corporations §7123, at 13-14 (1980 Supp.).

The instant case, in any event, is not a personal injury case, so there is no reason to consider any broadening of the four established exceptions to the general rule of nonliability for purchasers of assets. Illinois cases not involving personal injury have adhered to the general rule. (See *Commercial National Bank v. Newtson* (1976), 39 Ill. App. 3d 216, 217-18, 349 N.E.2d 138 (most of former corporation's assets were purchased by new corporation; 25% owner of former corporation acquired 40% ownership of new corporation; new corporation held not a "re-incarnation" of former corporation and not liable for debts); *Buis v. Peabody Coal Co.* (1963), 41 Ill. App. 2d 317, 322-23, 190 N.E.2d 507 (where former corporation's coal mining activities caused subsidence of surface land, corporation that bought assets of former corporation not liable for damage).) In consideration of the foregoing, the trial court was correct in finding, as a matter of law, that Temp-Tech could not be liable for plaintiff's claim.

Affirmed.

PERLIN, P. J., and DOWNING, J., concur.