**NCC SUNDAY INSERTS, INC. and Marketing Corporation of America, Plaintiffs,**

v.

**WORLD COLOR PRESS, INC., Defendant.**

No. 86 Civ. 9647 (GLG).

United States District Court, S.D. New York.

March 12, 1991.

Levett, Rockwood & Sanders, Westport, Conn. (Madeline F. Grossman, Dorit S.

Heimer, of counsel), Friedman, Wang & Blieberg, P.C., New York City, for plaintiffs and counterclaim defendant GV Investments [GFV], Inc.

Gallop, Johnson & Neuman, St. Louis, Mo. (David W. Harlan, Thomas M. Newmark, Dorothy L. McMurtry, of counsel), Latham & Watkins, New York City (John D. Shyer, Jennifer L. Adams, of counsel), for World Color Press, Inc.

## OPINION

GOETTEL, District Judge:

This action involves a contract dispute between the plaintiffs, publishers of free-standing color coupon advertising inserts seen in Sunday newspapers throughout the country, and the defendant, a printer hired on an exclusive basis by plaintiffs for these projects. Unfortunately, due to the extremely complex nature of the contracts at issue and the relationships among the parties, not to mention the free-standing insert industry itself, this is hardly a run-of-the-mill contract dispute. Discovery having finally been completed, we are now presented with extremely voluminous summary judgment motions by each of the parties, including a counterclaim defendant, GV Investments [GFV], Inc., whose relationship to the underlying dispute will be explained shortly.[1]

## I. FACTS

Plaintiff NCC Sunday Inserts, Inc. ("NCC") was, until November 1986, in the business of publishing free-standing coupon inserts. Plaintiff Marketing Corporation of America ("MCA") indirectly owned all of NCC's stock.[2] Both plaintiffs are Connecticut corporations. On December 28, 1982, plaintiffs entered into a contract with defendant World Color Press, Inc. ("WCP"), an Illinois corporation maintain-

---

1. Previous published decisions of this court in the instant action can be found at 692 F.Supp. 327 (S.D.N.Y.1988) (motion to dismiss for failure to plead fraud with particularity) and 666 F.Supp. 47 (S.D.N.Y.1987) (motion for change of venue).

2. NCC's stock was owned by Newspaper Co-op Couponing, Inc., which in turn was owned by MCA. Newspaper Co-op Couponing published black and white inserts for MCA.

ing a sales office in New York.[3] Pursuant to the contract, which by its terms initially ran until December 31, 1985, WCP was to print all of plaintiffs' insert "requirements." Additionally, the contract mandated that WCP not print any inserts for plaintiffs' competitors. The contract also provided that successors and assigns of the parties would be bound by it. The contract was extended three times, the latest extension occurring on July 30, 1986 and running until December 31, 1994. In October 1986, however, plaintiffs notified defendant that they were interested in selling their insert operations. Plaintiffs allegedly had concluded that price-wars in the insert market rendered their continuation in the business economically unfeasible. Although WCP expressed an interest in acquiring the business and negotiations actually had ensued (the parties reached the point of making offers and counteroffers), NCC's assets ultimately were sold for $14.5 million in early November 1986 to GFV Communications, Inc., now known as GV Investments [GFV], Inc. ("GFV").[4] The sales agreement contained specific provisions whereby GFV assumed no liability or obligation for the requirements contract and NCC agreed to be held responsible for all liabilities and obligations GFV had not assumed. On November 20, 1986, plaintiffs wrote to defendant and terminated the contract. In December of that year, WCP printed its first and final issue of inserts for GFV since GFV had its own in-house printing capacity and had no need for an outside printer.

Thereafter, plaintiffs filed the instant action. The complaint, which has since been amended four times, now contains four counts. In the first count, plaintiffs seek a declaration that they did not violate the contract by reducing their requirements to zero through the sale of NCC to GFV and the subsequent cancellation of the contract. The second, third, and fourth counts seek damages due to alleged misrepresentations and omissions by defendant relating to: (1) a hidden recovery by WCP of its share of perforating and numbering equipment, the cost of which plaintiffs allege was to have been split between plaintiffs and defendant; (2) an overcharge by WCP for its paper costs by failing to adjust its initial estimates to reflect actual costs; (3) double billing by WCP for "makereadies";[5] (4) double billing by WCP for "brownlines";[6] (5) overcharges by WCP for collating; (6) overcharges by WCP for labor costs; and (7) a failure by WCP to adjust prices to reflect alleged agreements among the parties as to WCP's permissible profits. Not only do plaintiffs allege that the foregoing acts amounted to contract breaches, but also that they were unfair trade practices as defined by the Connecticut Unfair Trade Practices Act, Conn.Gen.Stat.Ann. § 42–110a et seq., and common law frauds.

One day after this action was filed, WCP filed its own complaint against plaintiffs and GFV in the Southern District of Illinois charging breach of contract, promissory estoppel, and tortious interference with contract. That action was stayed, and ultimately voluntarily dismissed, in order to avoid duplicative litigation in light of WCP's assertion of counterclaims in the action before us that virtually mirrored those claims asserted in Illinois. WCP's Fourth Amended Counterclaim, which contains six counts, first alleges that plaintiffs violated the contract by terminating it, notwithstanding the sale of NCC to GFV. The second count seeks damages against GFV for breach of contract because of its failure to continue the contract. WCP's third count asserts a claim of promissory estoppel against plaintiffs herein, while the next count suggests that plaintiffs and GFV tor-

---

**3.** The contract actually was by and among BFD Color Inserts, Inc. ("BFD"), Marketing Corporation of America, and World Color Press, Inc. BFD is simply a previous name of NCC.

**4.** In addition to the $14.5 million paid for NCC's assets, GFV paid an additional $10.5 million for Newspaper Co-op Couponing's black and white insert business. WCP's bids were also for both

the color and black and white insert businesses owned by MCA.

**5.** The term "makeready" refers to the process of preparing a press to print a specific job.

**6.** Brownlines are a type of proof created by WCP as part of the production process.

tiously interfered with WCP's contract. Finally, the fifth and sixth counts contend that plaintiffs and GFV failed to pay for services rendered by WCP prior to plaintiffs' attempt to terminate the contract.

The parties now move for partial summary judgment on many of the claims and counterclaims.

## II. DISCUSSION

The standards for resolving motions for summary judgment are well settled. Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). The burden is on the moving party to demonstrate the absence of a material, factual dispute. Fed.R.Civ.P. 56(e). If that burden is met, the non-moving party cannot simply contend that its complaint sets forth a valid cause of action. *Id.* It "must set forth specific facts showing that there is a genuine need for trial," *id.*, and there must be more than merely "some metaphysical doubt as to [those] material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In determining whether this burden is met, however, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam). Against this backdrop of summary judgment jurisprudence, we turn to the instant motions.

### A. *Plaintiffs' Motion for Partial Summary Judgment*

Plaintiffs move for judgment dismissing counts one, three, and four of WCP's Fourth Amended Counterclaim, which allege a breach of contract, promissory estoppel, and tortious interference with contract, respectively. With respect to the

breach of contract counterclaim, plaintiffs' argument is straightforward. They contend that since the contract was a requirements contract requiring WCP to print only their insert requirements, *see* 12/28/82 Contract ¶ I, they had the right to terminate the contract prior to the date specified in the contract if in "good faith" they had no further requirements. Consequently, plaintiffs argue that they acted in good faith by terminating the contract because they faced impending financial disaster if they had remained in the insert business. In turn, defendant first argues that Illinois law, which the parties agree governs this issue pursuant to the express terms of the contract, *see* 12/28/82 Contract ¶ XVIII [*sic*, XXVIII], does not follow the good faith standard employed by the majority of jurisdictions, but rather, implies a duty upon a requirements buyer to remain in business until the expiration of the contract. In addition, WCP argues that the parties' course of dealing, as well as the contract itself, created an obligation for plaintiffs to remain in business. Finally, defendant argues that even if the good faith doctrine applies, such that plaintiffs could have eliminated their requirements absent bad faith motivations, this burden has not been satisfied because plaintiff was not facing dire financial straits, but instead, was simply attempting to avoid the terms of what it perceived as an unfavorable contract.

The general rule with respect to requirements contracts is that " 'the seller assumes the risk of all good faith variations in the buyer's requirements even to the extent of a determination to liquidate or discontinue the business.' " *Empire Gas Corp. v. American Bakeries Co.*, 840 F.2d 1333, 1337–38 (7th Cir.1988) (quoting *HML Corp. v. General Foods Corp.*, 365 F.2d 77, 81 (3d Cir.1966)).[7] In this respect, a buyer's ability to *reduce* its requirements differs significantly from its ability to *increase* its requirements where "unreasonably disproportionate" demands to those

---

7. We recognize that plaintiffs in the case at bar are not the traditional type of requirements buyers seen in most contracts of this nature. Plaintiffs are not purchasing what they need of

a particular item from the defendant, but rather, are receiving defendant's services to the extent they are needed. Nonetheless, our inquiry need not change.

estimated or previously required are not permissible. *Id.* at 1337. In resolving the question of good faith, there is no established standard, *see id.* at 1339 ("the term [has no] settled meaning in law generally; it is a chameleon"), but it is clear that one need not adduce evidence sufficient to implicate a contract's *force majeure* clause or to establish the affirmative defenses of impossibility, impracticability, or frustration of purpose. *Id.* at 1340. The proper inquiry requires an analysis of the buyer's subjective motives to determine if it had a legitimate business reason for eliminating its requirements, as opposed to a desire to avoid its contract. *Id.* at 1339 (decision must be "independent of the terms of the contract or any other aspect of [the buyer's] relationship with [the seller]"); *see also Agfa–Gevaert, A.G. v. A.B. Dick Co.,* 879 F.2d 1518, 1522–23 (7th Cir.1989) ("a requirements contract is not just an option to buy").

We now look to what plaintiffs contend were their good faith reasons for selling NCC's assets to GFV. Upon NCC's entry into the insert market in 1983, there were three other publishers in the business, including GFV. These four competitors remained in the business until 1986. In 1986, however, plaintiffs allege that significant price-wars began in the industry and that lowering prices was the only way to remain competitive. Of course, lowering prices without lowering costs leads, at a minimum, to reduced profits and there is the potential for economic ruin if one is operating at a sufficiently low profit margin. Plaintiffs determined that they had little ability to lower their costs because they depended upon outside printers to do their work, while integrated firms, like GFV and the other two competitors in the business, did their printing in-house and, therefore, had a greater ability to control their costs.[8] Plaintiffs allege that had they remained in the business, they would have lost between 14 and 48 million dollars for the eighteen months following January 1, 1987. *See* Plaintiffs' Memorandum of Law in Support

at 12–13. Therefore, plaintiffs decided that selling NCC was the safest means of avoiding catastrophic losses.

As previously noted, WCP's response to the foregoing is that notwithstanding the pronouncements of the Seventh Circuit on Illinois law, *see Empire Gas Corp.,* 840 F.2d at 1338 ("[w]e conclude that the Illinois courts would allow a buyer to reduce his requirements to zero if he was acting in good faith"), Illinois actually has adopted a different standard. WCP contends that the Illinois courts impose upon a requirements buyer an obligation to remain in business throughout the term of the contract. *See In re United Cigar Stores of Am.,* 72 F.2d 673, 675 (2d Cir.) (dicta) (citing *Chalmers & Williams v. Walter Bledsoe & Co.,* 218 Ill.App. 363 (1920), as authority for impliedly obligating a requirements buyer to have requirements throughout the term of the contract), *cert. denied,* 293 U.S. 617, 55 S.Ct. 210, 79 L.Ed. 706 (1934)). At this stage, it is unclear, but extremely doubtful, that Illinois law at present is any different than the general rule throughout the country such that a requirements buyer would have to remain in business until the contract expires, absent evidence of impossibility, impracticability, or frustration of purpose. The cases WCP cites in support of this proposition, *see Minnesota Lumber Co. v. Whitebreast Coal Co.,* 160 Ill. 85, 43 N.E. 774, 777 (1895); *M.I.G. Investments, Inc. v. Marsala,* 92 Ill.App.3d 400, 47 Ill.Dec. 265, 414 N.E.2d 1381 (1981), simply do not establish the broad standard WCP suggests. At this stage, however, we need not definitively resolve this question.

■ Alternatively, WCP contends that the parties' course of dealing, as well as the contract's express terms, imposed a duty upon plaintiffs to remain in business. It is uncontroverted that a promise to remain in business can be implied from either the parties' course of dealing or the contract itself. *See Tri–State Generation & Transmission Ass'n v. Shoshone River*

---

**8.** One of the reasons WCP allegedly was approached and expressed an interest in acquiring NCC was that its in-house printing capabilities would have permitted it to run an integrated operation.

*Power, Inc.*, 874 F.2d 1346, 1355 (10th Cir. 1989). In *Shoshone River*, for example, the defendant, a energy distribution cooperative, had entered into a contract with Tri–State to purchase its electric power requirements from Tri–State. Shoshone River's requirements were based, in part, upon the requirements of its members. The court held that Shoshone River had an implied duty to remain in business provided its members still had requirements. *Id.* at 1356. Similarly, in the case at bar, one might impose upon plaintiffs a duty to remain in business as long as advertisers were continuing to seek plaintiffs' services, which they clearly were since plaintiffs allegedly had obtained almost $50 million worth of advertising commitments for 1987. In fact, most of these commitments ultimately were taken over by GFV following the sale of NCC's assets. Once again, however, we need not formally resolve this particular question.

■ We find that this motion can be decided solely on plaintiffs' claim that they had the right to terminate their contract based on their allegedly good faith belief that remaining in the business would lead to economic ruin. As we have noted, WCP vehemently objects to the application of this good faith standard. Nonetheless, it suggests that even if it is applicable, plaintiffs did not act in good faith in selling their business. WCP points to the affidavit of its expert Robert Page, who recognized that while plaintiffs might have upwards of $35 million in losses for 1987 and 1988 if they could not lower their costs,[9] he predicted significant profits from 1989 until 1994, when the contract was ultimately to expire, if plaintiffs had remained in business. *See* Page Affidavit ¶ 5 (June 8, 1990). Therefore, drawing all inferences in favor of WCP, as we are required to do, it is a question of fact whether it is bad faith to sell one's business when it will incur losses for two years, but then turn a significant profit based on a resurgence in the insert market. We simply cannot decide this at the present time.[10] Moreover, since plaintiffs had procured contract commitments from advertisers for 1987, and GFV ultimately was able to take over most of these accounts, it does not appear that the elimination or reduction of advertisers was the only factor leading plaintiffs to sell NCC. It is difficult to determine at this stage whether plaintiffs' desire to terminate the contract developed independent of its contract with WCP. Had plaintiffs originally entered into a more favorable contract with WCP, they might have been able to withstand the price-wars, notwithstanding the fact that NCC was not an integrated operation. Finally, we note that while plaintiffs contend that disastrous losses loomed ahead, in its negotiations with GFV it was only suggesting that it was experiencing a "downturn" in the market. While this simply may have been puffery, it may also be an indication of the actual state of NCC's finances. For all the foregoing reasons, we cannot decide if plaintiffs' termination of the requirements contract was committed in good faith. Consequently, even assuming the good faith standard applies, plaintiffs' motion for summary judg-

---

**9.** This prediction is based on the costs NCC would have encountered absent price concessions from WCP. WCP suggests that they would have given plaintiffs the $35 million in price concessions that would have been necessary for them to break even in 1987 and 1988. In fact, early in 1986, and throughout the early years of the contract for that matter, WCP had given price concessions to plaintiffs. Plaintiffs, on the other hand, while admitting that price concessions had been given on other occasions, suggest that concessions of $35 million over two years were never offered and would have been unprecedented and outrageous. Plaintiffs also point to the fact that the initial purchase offer they received from WCP was for significantly less than the concessions needed (the parties

dispute whether WCP's offer, which was for both the color and black and white insert businesses, was $3 million or $15 million because it included an initial $3 million payment and two contingent $6 million payments). We tend to doubt that such astronomical concessions would have been made, but need not resolve this issue at present.

**10.** Plaintiffs point to the fact that Page's initial prediction as to the plight of NCC was much less sanguine than is his present analysis. While this certainly provides fodder for plaintiffs' cross-examination fire, it does not change our conclusion on this motion.

ment on the first count of WCP's Counterclaim must be denied.

We now turn to plaintiffs' motion to dismiss count three of WCP's Counterclaim. This claim seeks damages, including lost profits, under the theory of promissory estoppel. In essence, WCP claims that it relied on allegedly unambiguous promises by plaintiffs that it would be the exclusive printer of plaintiffs' requirements and, more importantly, that plaintiffs would have requirements until 1994. WCP's reliance purportedly is evident from its purchase of new equipment to meet plaintiffs' requirements, its expansion of its Illinois printing facility, including a substantial increase in its workforce, its entry into long-term paper supply contracts to meet plaintiffs' needs, and its refrain from entering into outside printing contracts due to the exclusive nature of its relationship with NCC.

Promissory estoppel is an equitable remedy making binding any "promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee." *Restatement (Second) of Contracts* § 90(1), at 242 (1981). It "is a narrow doctrine designed to enforce a contract in the interest of justice where some contract formation problem would otherwise prevent enforcement." *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F.Supp. 712, 735 (S.D.N.Y.1989). The elements that must be proven to establish such a claim are: "(1) a promise; (2) which should reasonably have been expected by the promisor to induce substantial action or forebearances ...; (3) which induced such

action or forebearance; and (4) which must be enforced to avoid injustice." *Pudil v. Smart Buy, Inc.*, 607 F.Supp. 440, 444 (N.D.Ill.1985) (Illinois law) (citing *Kulins v. Malco, Inc.*, 121 Ill.App.3d 520, 76 Ill.Dec. 903, 910, 459 N.E.2d 1038, 1045 (1984)).[11]

Turning to the elements of the claim, plaintiffs first contend that there is no unambiguous promise to remain in business that can be proven. We agree that WCP's evidence of such a promise is extremely weak and strongly doubt if any jury would conclude that such a promise existed. However, we will assume for these purposes that such a promise was made and that WCP relied on it to its detriment. The remaining questions, therefore, are whether plaintiffs could have reasonably expected WCP to rely on such a promise and, if so, whether the interests of justice require that such promise be enforced.

An action for promissory estoppel generally lies when there is no written contract, or the contract cannot be enforced for one reason or another. Thus, it is an action outside the contract. When an enforceable contract does exist, the parties cannot assert a claim for promissory estoppel based on alleged promises that contradict the written contract. *Gulf Oil*, 725 F.Supp. at 735; *St. Joseph Data Serv., Inc. v. Thomas Jefferson Life Ins. Co.*, 73 Ill. App.3d 935, 30 Ill.Dec. 575, 581–82, 393 N.E.2d 611, 617–18 (1979). An untenable situation would result if notwithstanding the existence of a written, enforceable contract, a party could sue for promissory estoppel based on contradictory promises that it allegedly relied on. In this case, the

---

11. The parties disagree on whether Illinois' or Connecticut's law should apply to the issue of promissory estoppel. While the contract provides for construction of the agreement under Illinois law, promissory estoppel, by definition, is a claim outside the contract and, therefore, the parties' choice of law is not binding. Engaging in a choice of law analysis requires us to apply New York's choice of law rules since this case is based solely on diversity jurisdiction. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). The parties agree that under New York law, the law of the state with the most significant contacts would apply. *Index Fund, Inc. v. Insurance Co. of N. Am.*, 580 F.2d 1158, 1162 (2d

Cir.1978), *cert. denied*, 440 U.S. 912, 99 S.Ct. 1226, 59 L.Ed.2d 461 (1979). The parties disagree, however, on whether Illinois, WCP's choice, or Connecticut, plaintiffs' choice, has the most significant contacts. We tend to think that Illinois has the most significant contacts with respect to this claim for promissory estoppel. While the alleged promises were not necessarily made in Illinois, the alleged detrimental reliance forming the basis of WCP's claim occurred in Illinois. This appears to be more significant in terms of conflict of law analysis. Notwithstanding this conclusion, however, the parties agree that the law of promissory estoppel is virtually identical in both Illinois and Connecticut.

parties entered into a requirements contract that was to expire in 1994 and that contract was enforceable. The majority rule, as previously noted, is that a requirements buyer can eliminate its requirements, even to the extent of selling its business, if that decision is made in good faith, which we previously found to be a disputed issue of fact. To the extent WCP is attempting to recover based on promises that allegedly contradict this good faith requirement, such a claim cannot be based on promissory estoppel. Holding otherwise would allow a party to seek damages based on promissory estoppel any time it did not like a contract's terms, or the legal interpretations of such terms. This cannot be countenanced and the interests of justice do not demand that plaintiffs' alleged promises be enforced in a claim for promissory estoppel.

We recognize that WCP argues for the application of a standard other than that of good faith, one which demands that a requirements buyer stay in business throughout the term of the contract. As we previously stated, we are not much impressed with this argument. However, even if the law did require plaintiffs to stay in business, WCP's breach of contract claim provides adequate protection of its rights. Similarly, if such a promise by plaintiffs can be gleaned, either expressly or implicitly, from the contract itself or from the parties' course of dealing,[12] these allegations also can be raised as part of WCP's breach of contract claim. Therefore, there is no injustice to be avoided by permitting the enforcement of these alleged promises under a theory of promissory estoppel.[13]

For all the foregoing reasons, summary judgment is granted in plaintiffs' favor on WCP's promissory estoppel counterclaim.

 Finally, plaintiffs seek to have the fourth count of the Counterclaim dismissed. WCP contends that plaintiffs tortiously interfered with the contract between plaintiffs and WCP by selling NCC's assets to GFV. Plaintiffs argue that a party cannot tortiously interfere with its own contract. While this is the generally accepted rule, see *F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago*, 754 F.2d 216, 221 (7th Cir.), *cert. denied*, 474 U.S. 824, 106 S.Ct. 79, 88 L.Ed.2d 64 (1985), WCP points to an Illinois authority suggesting that notwithstanding the general rule, a party "can be sued for conspiracy with a third party who has induced him to breach his contract resulting in actual damage." *Blivas & Page, Inc. v. Klein*, 5 Ill.App.3d 280, 282 N.E.2d 210, 214 (1972).[14] However, that same court also recognized that "a party cannot be sued in tort for inducing the breach of his own contract." *Id.* Thus, before a party can be held liable for conspiring to tortiously interfere with its own contract, there must be some other party who can be held liable for actually inducing the breach of contract (*i.e.*, tortiously interfering with the contract). In the case at bar, there is no such party. While WCP has asserted a counterclaim against GFV for tortiously interfering with WCP's contract with plaintiffs, as will be seen, GFV is entitled to summary judgment on that claim. *See infra* pp. 1015–

---

**12.** WCP suggests that an implied promise to remain in business existed based on the contract extensions, the price concessions plaintiffs received, and WCP's exclusive relationship with plaintiffs.

**13.** Of course, we must note that WCP's breach of contract claims remain subject to any defenses plaintiffs may seek to assert, such as the fact that the contract contains an integration clause. The integration clause stated that "[t]his Agreement together with all Exhibits attached hereto and made a part hereof shall constitute the entire Agreement between the parties hereto and may not be amended in any manner unless such amendment shall be agreed to in writing by the parties hereto." 12/28/82 Contract ¶ XXXI. The existence of this clause in the contract itself may have made it unreasonable for WCP to have relied on any alleged outside promises to remain in business for the full term of the contract, which would have been a further reason for denying a claim of promissory estoppel. *See Gulf Oil*, 725 F.Supp. at 735; *Levitt Homes Inc. v. Old Farm Homeowner's Ass'n*, 111 Ill.App.3d 300, 67 Ill.Dec. 155, 165, 444 N.E.2d 194, 204 (1982).

**14.** Plaintiffs contend that Connecticut law should govern our resolution of this issue. We need not resolve the question and will simply rely on Illinois law as WCP suggests.

1016. One of our principal reasons for this conclusion is that GFV did not induce plaintiffs to breach their contract, but rather, simply contacted a willing seller. In fact, plaintiffs had gone to WCP to see if it was interested in purchasing NCC's assets before they had any contact with GFV. Granted, the evidence before us suggests that GFV contacted plaintiffs before plaintiffs ever contacted GFV. This begs the question, however, because by the time GFV contacted plaintiffs it was clear that plaintiffs were interested in selling NCC. The fact that GFV contacted plaintiffs simply does not establish that GFV "induced" plaintiffs to sell NCC or to breach the contract with WCP. Therefore, since neither GFV, nor any other party for that matter, can be held liable for tortiously interfering with WCP's contract, plaintiffs cannot be held liable for conspiring to interfere with their own contract. Accordingly, summary judgment is granted to plaintiffs on count four of WCP's Counterclaim.

### B. *GFV's Motion for Partial Summary Judgment*

We now turn to GFV's motion for summary judgment on counts two and four of WCP's Counterclaim.[15] Count two alleges that GFV, as NCC's successor, succeeded to NCC's obligations under the NCC/WCP requirements contract. Count four, as has previously been discussed, alleges that GFV tortiously interfered with that contract. Of course, GFV denies these charges. The only other claims against GFV are counts five and six of the Counterclaim in which WCP seeks payment for invoices submitted to NCC for printing in November and December of 1986. *See infra* p. 1018. GFV has not moved for summary judgment on these claims.

Count two alleges that GFV breached the existing contract between NCC and WCP under a theory of successor liability. WCP contends that by purchasing NCC's assets, GFV "succeeded to the liabilities and obligations of NCC under the Requirements Contract." Fourth Amended Counterclaim ¶ 30. As a general rule, the purchaser of another's business assets for cash does not assume the seller's debts or obligations. *Green v. Firestone Tire & Rubber Co.*, 122 Ill.App.3d 204, 77 Ill.Dec. 591, 594, 460 N.E.2d 895, 898 (1984); *M.I.G. Investments v. Marsala*, 92 Ill.App.3d 400, 47 Ill.Dec. 265, 268, 414 N.E.2d 1381, 1384 (1981); *Pelc v. Bendix Mach. Tool Corp.*, 111 Mich.App. 343, 314 N.W.2d 614, 617–618 (1981).[16] WCP does not dispute the fact that the NCC/GFV transaction was a cash for assets transfer, which ordinarily would implicate the general rule and absolve GFV of liability. However, WCP argues that there are exceptions to the general rule that render GFV liable as NCC's successor.

In both Illinois and Michigan a purchaser of assets for cash may be liable for the seller's obligations under any of the following circumstances: (1) where there is an express or implied agreement to assume the transferor's liability; (2) where the transfer is merely a merger or consolidation of the two corporations, the so-called "de facto merger"; (3) where the purchasing corporation is merely a continuation of the transferor; or (4) where the transaction is for the fraudulent purpose of enabling the seller to avoid its obligations. *Green*, 77 Ill.Dec. at 594–95, 460 N.E.2d at 898–99; *M.I.G. Investments*, 47 Ill.Dec. at 268, 414 N.E.2d at 1384; *Illinois ex. rel. Donahue v. Perkins & Will Architects, Inc.*, 90 Ill. App.3d 349, 45 Ill.Dec. 696, 698, 413 N.E.2d 29, 31 (1980); *Pelc*, 314 N.W.2d at 618. In addition, Michigan recognizes a "bad faith" exception, which can be established "where some of the elements of a purchase in good

**15.** We denied a prior application by GFV for summary judgment in September 1988 because it was untimely in light of pending discovery.

**16.** GFV, pointing to the requirements contract's choice of law clause, *see* 12/28/82 Contract ¶ XVIII [*sic*, XXVIII], contends that Illinois law governs the issue of successor liability. WCP on the other hand, argues that Michigan law, which

is where GFV is located, should apply. While we believe Illinois law properly governs this issue under a most significant contacts analysis, *see supra* note 11, we will refer to the laws of both states since even WCP recognizes that there is little difference between them on the relevant issues.

faith are lacking, or where the transfer was without consideration and the creditors of the transferor were not provided for." *Id.* In the case at bar, WCP ignores the first three exceptions, but argues that the NCC/GFV transaction amounted to fraud [17] and that it was consummated in bad faith.[18]

█ WCP bases its initial argument for successor liability on the fraud exception. While admitting that there is a paucity of caselaw analyzing this exception, WCP nonetheless contends that the exception applies to the facts before us. Unfortunately, WCP fails to adduce a shred of evidence suggesting that the transfer between GFV and NCC involved any fraudulent activities. In *Panther Pumps & Equipment Co. v. Hydrocraft, Inc.*, 566 F.2d 8, 26–28 (7th Cir.1977), *cert. denied*, 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978), for example, the court applied the exception where the president of Hydrocraft purchased all of its outstanding stock for two hundred dollars and then transferred all of its assets to his own newly created company, rendering Hydrocraft a worthless shell. Evidence presented before the court established that the president specifically had stated that the entire purpose behind the transaction was to prevent plaintiff from collecting on its previously obtained judgment against Hydrocraft. In light of this, the court, which concluded that the asset purchasing company was merely an alter ego of the president, ordered the president substituted as the judgment debtor.

The facts presented in the case at bar, however, are dramatically different than those in *Panther Pumps*. In *Panther Pumps*, the court specifically concluded that the purpose of the transaction was to defraud the transferor's creditors. Here, however, there is absolutely no suggestion that NCC's sale to GFV was an attempt to defraud creditors. First of all, WCP, while obviously having an interest in the continu-

ation of its contract with NCC, is not in the same position as a judgment creditor. More importantly, however, there is absolutely no suggestion that the transaction amounted to an attempt to fraudulently permit NCC to avoid its obligations. WCP was well aware of NCC's intention to sell its business, having been a potential buyer itself. NCC's transaction was conducted at arms length and it is clear that NCC obtained considerably greater consideration from GFV than WCP had offered. In addition, there is no suggestion that NCC had any proprietary interest in GFV. In fact, since GFV competed with NCC in the insert market, and not with WCP because GFV did not engage in outside commercial printing, its purchase constituted a rational business decision to eliminate a competitor.

█ Having resolved the fraud argument adduced by WCP, we now turn to its claim that the parties somehow acted in bad faith. The one case WCP cites in support of this theory is *Pelc v. Bendix Machine Tool Corp.*, 111 Mich.App. 343, 314 N.W.2d 614 (1981), which was a products liability action. To the extent such a rule, which the court announced in dicta, may be applicable in the non-products liability case before us, however, the *Pelc* court is unhelpful since it engages in no analysis of the rule's parameters. In fact, one Illinois case NCC cites suggests that to the extent there may be a bad faith exception in such transactions, perhaps by virtue of an implied covenant of good faith, it is analogous to the fraud exception. *See Alan Drey Co. v. Generation, Inc.*, 22 Ill.App.3d 611, 317 N.E.2d 673, 678 (1974). That case again involved an attempt by a party to defraud its creditors by selling its assets after plaintiff had obtained a judgment against it. The court held that the purchaser was a participant in the fraud and, therefore, could be held liable on the judgment.

---

**17.** Some courts hold that the fraud exception refers specifically to the transferor's attempt to defraud its creditors. *See Perkins & Will Architects*, 45 Ill.Dec. at 698, 413 N.E.2d at 31 (citing 15 W. Fletcher, *Cyclopedia of Corporations* § 7122, at 188–89 (1973)).

**18.** As to Michigan's "bad faith" exception, WCP only contends that its first prong (*i.e.*, that it was not a purchase in good faith) was violated. WCP does not suggest that NCC did not receive consideration or that NCC did not provide for its creditors.

We will assume that there is a bad faith exception available in this case. WCP points to numerous factors supposedly establishing bad faith in the NCC/GFV transaction, such as the fact that GFV knew of the requirements contract and that NCC did not demand that GFV assume the contract as allegedly required by the successors and assigns clause. Even if some of these factors did suggest that NCC acted in bad faith in selling to GFV—in fact, we previously denied plaintiffs' motion for summary judgment on the issue of whether plaintiffs' reduction of its requirements to zero by selling NCC's assets was a decision made in good faith—it is an entirely different issue when WCP is attempting to bind GFV, a third-party purchaser who was not involved in the initial contract. As noted in *Alan Drey*, "[m]erely showing a fraudulent intent on the part of the transferor is insufficient ... to impose liability on the transferee." 317 N.E.2d at 680. There simply is no suggestion of bad faith or fraud in GFV's actions. GFV purchased NCC's assets for significantly more than WCP had offered and the agreement between GFV and NCC specifically stated that NCC, with MCA and Newspaper Co-op Couponing, Inc. as guarantors, would remain liable for any obligations on the NCC/WCP contract. 11/13/86 Asset Purchase Agreement ¶ 1.4(d). Thus, WCP was provided for and can, as it has, seek relief from NCC and MCA. *Cf. M.I.G. Investments, Inc. v. Marsala*, 92 Ill.App.3d 400, 47 Ill.Dec. 265, 268–69, 414 N.E.2d 1381, 1384–85 (1981) (no fraud creating successor liability when seller performed on the contract until sale made and remained liable on the contract even after the sale).

■ Additionally, the existence of the successors and assigns clause is of no moment with regard to successor liability. As we previously stated, the purchaser in a cash for assets transfer will only be liable for the obligations of the transferor corporation if one of the recognized exceptions applies. There is no additional exception because of the existence of a successors and assigns clause. In *Shaw v. Republic Drill Corp.*, 810 F.2d 149, 150 (7th Cir. 1987), for example, the court refused to carve out an additional exception to the rule when an employee sued his employer's successor for breach of contract on the basis of an employment contract which stated that the employer's successors were bound by the contract. Similarly, in *M.I.G. Investments, Inc. v. Marsala*, 92 Ill.App.3d 400, 47 Ill.Dec. 265, 268–69, 414 N.E.2d 1381, 1384–1385 (1981), the court concluded that notwithstanding the existence of a successors and assigns clause, the successor corporation was not liable for the existing contract because none of the recognized exceptions was applicable. Although the court concluded that the purchaser was unaware of the preexisting contract, it did not, as WCP intimates, suggest that mere knowledge of the contract's existence was enough to create successor liability. Rather, the purchaser's knowledge may be relevant to establish liability based on one of the recognized exceptions. In the case at bar, however, as we have previously concluded, none of the exceptions is applicable. Therefore, GFV is entitled to summary judgment on count two of WCP's Counterclaim.

■ GFV also moves for summary judgment on count four of WCP's Counterclaim, which we previously noted alleges that GFV tortiously interfered with the NCC/WCP contract.[19] Tortious interference requires more than mere knowledge that one's actions may cause the breach of an existing contract. *R.E. Davis Chem. Corp. v. Diasonics, Inc.*, 826 F.2d 678, 686 (7th Cir.1987). Instead, Connecticut law requires proof that the defendant was "guilty of fraud, misrepresentation, intimidation or molestation ... or ... acted maliciously." *Robert S. Weiss & Assocs. v. Wiederlight*, 208 Conn. 525, 546 A.2d 216, 222–23 (1988) (citations omitted). In other words, an improper motive or means must be established. *Id.* (citations omitted). Illinois law demands no less stringent proof

---

19. Again, the parties disagree on the issue of whether Connecticut or Illinois law should apply. Since the laws are virtually identical on this question, we will refer to the laws of both states.

from a plaintiff. The five elements to be established are: "a valid contract, defendant's knowledge of the existence of the contract, defendant's intentional and malicious inducement of the breach of the contract, breach of the contract caused by defendant's wrongful conduct and resultant damage to the plaintiff." *R.E. Davis,* 826 F.2d at 685 (citations omitted); *see HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 137 Ill.Dec. 19, 23, 545 N.E.2d 672, 676 (1989). WCP contends that since malice in such cases "simply means that the interference must have been intentional and without justification," *id.,* 137 Ill.Dec. at 24, 545 N.E.2d at 677, the issue must go to the jury because concepts of intent and justification are questions of fact.[20]

■ In the case at bar, GFV argues that its purchase of NCC was motivated by a desire to eliminate a competitor from the market and that competitor was NCC. As noted previously, since GFV did not conduct commercial printing for outside companies, it did not compete with WCP. Moreover, there can be no doubt that NCC wanted to sell its business even before GFV ever expressed an interest in purchasing NCC since the uncontroverted evidence establishes that NCC initially had approached WCP with an offer to sell its assets. WCP suggests that the predisposition of NCC to sell its assets is irrelevant because the sale itself did not cause the breach of contract. Instead, WCP contends, the conditions placed on the sale by GFV, namely the fact that it would not assume the requirements contract and its demand of a non-compete clause from NCC, caused the contract's breach. The problem with this argument, however, is that it still fails to show any improper, malicious, or unjustified conduct by GFV suggesting an intent to cause the breach of contract. Granted, GFV knew of the NCC/WCP contract when it purchased

NCC's assets. Moreover, it probably can be inferred that GFV knew that if it purchased NCC's assets, NCC would no longer be able to comply with its contract with WCP. Nonetheless, these facts fail to establish anything more than an incidental interference with WCP's contractual rights and this is insufficient to create liability under a theory of tortious interference with contract. *See R.E. Davis,* 826 F.2d at 686 & n. 17 (quoting *Restatement (Second) of Torts* § 767 comment d, at 32; § 766 comment j, at 12; § 766 comment h, at 11 (1979)). GFV was acting in its own best business interests and there simply is no evidence to suggest that GFV intended to cause NCC to breach its contract with WCP.

For all the foregoing reasons, summary judgment is granted to GFV on count four of WCP's Counterclaim.

### C. WCP's Motion for Partial Summary Judgment

The final set of motions before us are those made by WCP. WCP seeks summary judgment dismissing the second, third, and fourth counts of the complaint and granting summary judgment on its fifth and sixth counterclaims. We will first address the motion seeking summary judgment on the various counts of the complaint since our resolution of that motion directly impacts upon our consideration of the other motion.

#### 1. Complaint counts two, three, and four

■ Count two of the complaint alleges that WCP breached the contract by various pricing overcharges. *See supra* p. 1007. WCP's motion focuses (to the extent legal memoranda totaling one hundred forty-three pages can be said to "focus" on anything),[21] however, upon paragraphs eighty-four through ninety of the Fourth Amended Complaint, the so-called "profit issue."

---

**20.** WCP also cites the district court's decision in *Waldinger Corp. v. Ashbrook–Simon–Hartley, Inc.,* 564 F.Supp. 970 (C.D.Ill.1983). On appeal, however, the Seventh Circuit remanded the case on the issue of tortious interference. 775 F.2d 781, 792 (7th Cir.1985). Moreover, the case

involved principles of agency and the concept of conditional privileges.

**21.** This total is exclusive of pages submitted in opposition to plaintiffs' and GFV's summary judgment motions.

Plaintiffs allege that "NCC and World had agreed that World would charge prices which produced a fair profit on the NCC work." Fourth Amended Complaint ¶ 84. Furthermore, plaintiffs contend that "World represented to NCC that it would monitor its prices and adjust them as warranted by experience." *Id.* Of course, WCP contends that no such promises were ever made and points to the fact that no such promises are contained in the contract, which contains an integration clause. Resolving this issue by determining whether such promises actually were made would necessarily involve a factual inquiry that obviously would preclude the granting of summary judgment. Therefore, WCP proffers a strictly legal argument, suggesting that the contract's integration clause, the parol evidence rule, and the statute of frauds prohibit plaintiffs from recovering on these alleged oral promises. At this stage, however, we need not resolve these issues.

Plaintiffs' breach of contract cause of action is not limited to the profit issue. Even assuming plaintiff is precluded as a matter of law from recovering based on the profit issue and, consequently, WCP would have been entitled to summary judgment, there are numerous questions of fact in existence with respect to the other alleged violations of the contract. For example, the contract required the parties to share the cost of certain equipment WCP had to purchase to meet plaintiffs' requirements and plaintiffs contend that WCP failed to satisfy this obligation. WCP's briefs do not touch on this issue in connection with the breach of contract claim. Moreover, plaintiffs allege that WCP overcharged them for brownlines, which are a type of proof created by WCP as part of its production process. While plaintiffs allege that one of WCP's employees, Jack Egan, can testify as to double billing, WCP claims that a former NCC employee, Larry Schneider, has testified to the contrary. Obviously, this is an issue of fact for trial. We do not see any need to go through each segment of plaintiffs' breach of contract claim to determine whether questions of fact exist. Suffice it to say that so long as long as there are fact questions in existence for some portions of the breach of contract claim, which is not limited to the profit issue as WCP seems to suggest, summary judgment cannot be granted.[22]

WCP next moves for summary judgment on the third and fourth counts of the complaint, which seek damages for unfair trade practices under Connecticut's Unfair Trade Practices Act and common law fraud, respectively. We will treat these together, notwithstanding the fact that they represent alternative means of recovery. As we have previously recognized during the course of this litigation, we consider this case to be a breach of contract action. *NCC Sunday Inserts, Inc. v. World Color Press*, 759 F.Supp. 1003 (S.D.N.Y.1989) (bench decision). The claims for fraud and unfair trade practices appear to be extremely weak and simply a means by which plaintiffs can seek a different measure of damages than are available under a strict breach of contract theory. In fact, we have twice dismissed plaintiffs' claims for failure to plead fraud with particularity pursuant to Federal Rule of Civil Procedure 9(b), each time granting plaintiffs leave to replead. *Id.; NCC Sunday Inserts, Inc. v. World Color Press, Inc.*,

---

**22.** At oral argument, WCP's counsel suggested that its motion concentrated on the profit issue because plaintiffs' complaint did so. In paragraph 90 of the complaint, plaintiffs allege that damages due to the profit issue alone are "believed to exceed $20,000,000." The total damages plaintiffs claim under the entire breach of contract cause of action, which has numerous subsections as has been noted previously, is also "believed to exceed $20,000,000." Fourth Amended Complaint ¶ 94. However, plaintiffs also make specific monetary claims for the other parts of the breach of contract claim, like brownlines and makereadies. Therefore, while plaintiffs' informal calculations may be off, and while the preponderance of plaintiffs' alleged damages stem from the profit issue, WCP can still lose on this cause of action if any of the other allegations fitting within the general rubric of breach of contract are proven. To the extent the integration clause, the parol evidence rule, or the statute of frauds may preclude proof of certain allegations, those issues can be taken up through evidentiary motions before or during the course of trial.

692 F.Supp. 327, 330 (S.D.N.Y.1988). The latest version of the complaint is not much better. Nonetheless, the proof that will be offered on the fraud and unfair trade practices claims will be virtually identical to that which will be adduced to prove the breach of contract claim. In fact, the complaint itself basically lists all of plaintiffs' factual allegations followed by blanket claims that these facts amount to breaches of contract, unfair trade practices, and common law frauds. Since we previously concluded that the breach of contract claims must go to trial, there is simply nothing to be gained by dismissing either the fraud or unfair practices claims. Granted, the elements that must be proven are different under each of the three theories. However, it is the same set of facts that the trier of fact will need to consider.[23] In addition, if after the close of plaintiffs' case we were to conclude that the fraud or unfair practice claims should not go to the jury, we would be required to enter a directed verdict. This course simply seems to be the most efficient. Therefore, WCP's motion for summary judgment on the third and fourth claims of plaintiffs' complaint is also denied.[24]

### 2. *Counterclaim counts five and six*

■ The final motion to be addressed is WCP's application for summary judgment on the fifth and sixth counts of its Counterclaim. These claims are based on breach of contract and quantum meruit for invoices of approximately $1.7 million, plus penalty charges and interest, that were submitted to plaintiffs for work performed by WCP in November and December of 1986. WCP suggests that these debts are liquidated damages and, therefore, plaintiffs have no right to set them off against their unliquidated claims for breach of contract, fraud, and unfair trade practices. In turn, plaintiffs contend that their disputes over these invoices became apparent during the course of discovery and are "inextricably interwoven" with their breach of contract claims. At this stage, we must agree. If plaintiffs prevail on their breach of contract claims, it may be that the invoices from November and December of 1986 will also be found to have been erroneous and, perhaps, though highly unlikely, fraudulent. We simply cannot resolve this issue at this stage and summary judgment must be denied.

### III. CONCLUSION

Plaintiffs' motion for summary judgment on count one of WCP's Fourth Amended Counterclaim is denied, but the motion is granted as to counts three and four of the Counterclaim. In addition, GFV's motion for summary judgment on counts two and four of the Counterclaim is granted. Finally, WCP's motion for summary judgment on counts two, three, and four of plaintiffs' Fourth Amended Complaint is denied, as is its motion for summary judgment on counts five and six of its Counterclaim. Discovery having been completed and all motions having been made and resolved, the case appears ready for trial.

SO ORDERED.

**23.** To the extent that proof of a fraud claim will require plaintiffs to establish reliance on promises outside the contract, plaintiffs may face the same difficulties WCP was confronted with on its promissory estoppel claim, namely that reliance may be unreasonable in the presence of an integration clause. *See supra* note 13.

**24.** With respect to the claims under the Unfair Trade Practices Act, we recognize that WCP raises defenses based on the statute's three-year limitations period as well as a requirement contained in an earlier version of the statute that plaintiffs allege an injury to the public interest.

In sum, WCP contends that any claims under the statute are limited to actions taken after April 11, 1985. As to actions after this date, the same factual questions raised in connection with the breach of contract issue exist. With respect to claims based on acts prior to this date, once again, proof of such acts will be adduced as part of the breach of contract claim. Therefore, we need not at this stage address the question of whether the claims potentially going to the jury under this statute must be limited to a certain time period.